UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05-CV-10918 LTS

_____ )

KATERINA LIBRIZZO )
 )
     Plaintiff )
 )
v. )
 )
THE BERKSHIRE COMPANIES LIMITED )
PARTNERSHIP, d/b/a THE BERKSHIRE )
GROUP, BERKSHIRE PROPERTY )
ADVISORS, L.L.C., BERKSHIRE INCOME )
REALTY, INC. and BERKSHIRE FINANCIAL )
COMPANY LIMITED PARTNERSHIP )
 )
     Defendants )
_____ )

## JOINT PRE-TRIAL MEMORANDUM

(a).    <u>Summary of the evidence</u>

<u>Plaintiff</u>

    The plaintiff, Katerina Librizzo, is a married woman with two children. Ms, Librizzo resides in Woburn, Massachusetts with her family. She works in accounting. The defendants are a conglomerate of real estate management, financiers, consulting and advising business entities located in Boston. Ms. Librizzo worked for the defendants as a Senior Accountant from September, 1999 until May 13, 2004, when the defendants terminated her employment.

    The plaintiff expects the evidence to show that while working for the defendants, the defendants discriminated against her on the basis of her pregnancy and then terminated her employment in retaliation for asserting her rights to be free from such discrimination.

The plaintiff expects the evidence to show that her job performance was quite positive and that the defendants recognized it to be quite positive until after December, 2001, when she first became pregnant.  Beginning in mid 2002, during Ms. Librizzo's first pregnancy, the defendants began a campaign of harassing conduct, including inaccurate negative performance reviews, requirements of unreasonable work hours, harassment relative to the need for pre-natal medical appointments and the need for maternity leave.

In the early part of 2003 (after the plaintiff's return from her first maternity leave), the defendants' treatment of Ms. Librizzo improved.  The defendants' review of Ms. Librizzo's work performance was again quite positive at that time.  In mid 2003, she became pregnant again and again began to need to attend pre-natal medical appointments, and again contemplated a second maternity leave.  The defendants again began a campaign of harassing conduct, including inaccurate unsubstantiated disciplinary action, requirements of unreasonable work hours, harassment relative to the need for pre-natal medical appointments and the need for maternity leave.

In October, 2003, the defendants began to require that Ms. Librizzo commit to an unlimited number of work hours, despite that they had previously promised that her work hours would be limited to the usual business hours.  Finally, on October 29, 2003, Ms. Librizzo obtained and produced a physician's note requiring that her weekly work hours be limited to 40. The defendants were angry and upset and felt that Ms. Librizzo was not genuine in her need for a 40 hour per week work restriction.  The next day, October 30, 2003, the defendants drafted two warnings relative to Ms. Librizzo's work performance.  They did not immediately provide the warnings to Ms. Librizzo.  On November 6, 2003, the plaintiff's attorney faxed a letter of representation to the defendants asking that they cease their discriminatory conduct.  The next

day, November 7, 2003, the defendants handed the plaintiff the two written warnings dated October 30, 2003.

The plaintiff expects the evidence to further show that the defendants planned to either force the plaintiff to resign her employment by subjecting her to intolerable conditions, or to terminate her after her return from maternity leave.  After the plaintiff's return from her second maternity leave in April, 2004, the defendants continued their campaign of harassment, including inaccurate unsubstantiated disciplinary action and requirements of unreasonable work hours, in an effort to force Ms. Librizzo to resign her employment.  When she did not, the defendants finally terminated her on May 13, 2004.

The plaintiff expects the evidence to show that the defendants' discriminatory and retaliatory action and termination of her employment caused her great deal of emotional distress. The defendants' termination also resulted in economic losses totaling over $80,000.00 in lost earnings ('back pay'), and continues to sustain losses in the form of future or 'front' pay.


<u>Defendants</u>

Plaintiff began her employment with Berkshire Financial Company, Limited Partnership in September 1999. The Berkshire Companies Limited Partnership, which is registered to do business as "The Berkshire Group," is a diversified real estate and financial services holding company.  Christopher Nichols, Accounting Manager, hired plaintiff as a senior accountant at that time.  While working for Berkshire Group, plaintiff was a salaried employee, rather than an hourly employee, and was considered part of the professional staff.   The general office hours for administrative and support staff who were eligible for overtime pay, were 8:45 a.m. to 5:30 p.m.

3

Plaintiff's job duties included preparing audit packs and treasury duties. Chris Nichols was plaintiff's supervisor until June 2001 when he was transferred to work for Berkshire Income Realty, Inc. Mr. Nichols was a "hands on" manager who would actively help plaintiff with her work. Plaintiff liked and respected Nichols and thought he was a good supervisor.

In June 2001, Wayne Zarozny became plaintiff's direct supervisor. Mr. Zarozny had a different management style than Mr. Nichols. Mr. Zarozny had more expansive responsibilities, and unlike Mr. Nichols, did not have time to rewrite plaintiff's work product and expected that she would work more independently. As time passed, Mr. Zarozny became aware that Librizzo did not seem to have a good grasp of accounting concepts and had difficulties thinking independently. Soon after Mr. Zarozny began supervising her, he raised concerns with her regarding her productivity and what he viewed as her spending too much time on the telephone on personal matters. His concerns with plaintiff's work performance predated her first pregnancy.

In approximately May 2002, the company decided to take Berkshire Income Realty, Inc., (a Real Estate Investment Trust operated by the company) public and list it on the American Stock Exchange, which required extensive preparatory work and filings, causing the workload of the accounting department to increase and requiring employees to work more hours at critical times, especially when the SEC filings were approaching.

Plaintiff was assigned to work on the SEC filing for Berkshire Income Realty. While other employees worked hard to complete their tasks, plaintiff routinely left work at 5:30 p.m. and continued to spend time unproductively during the general office hours. Additionally, the quality of plaintiff's work remained an issue. Management received complaints about plaintiff's work from PricewaterhouseCoopers, which provided outside auditing services to the Berkshire

Group her work from Pricewaterhouse-Coopers employees regarding the quality of plaintiff's work product. Mr. Zarozny spoke to plaintiff about these complaints. The plaintiff completely rejected any efforts at constructive criticism, and the relationship between the plaintiff and Mr. Zarozny became strained.

Plaintiff left on her first maternity leave in August 2002. She took approximately three months of maternity leave and was paid her full salary throughout her maternity leave, pursuant to the Berkshire Group's maternity leave plan. When she returned to work she received her evaluation. The evaluation identified areas where Mr. Zarozny thought plaintiff's work performance required improvement, including plaintiff's lack of commitment to her work, regularly missed deadlines, and shoddy work-product. The evaluation warned that if plaintiff did not correct these deficiencies, she risked the potential for reassignment or termination. The plaintiff refused to sign the evaluation.

In the spring, 2003, plaintiff was reassigned to the supervision of Christopher Nichols, with whom plaintiff previously had a good work relationship. In June 2003, Kelly McCusker, became employed with the company and reported to Mr. Nichols. She took over direct supervision of plaintiff, while Christopher Nichols had general oversight.

Mr. Nichols and Ms. McCusker had learned of plaintiff's history of work performance issues while working for Mr. Zarozny. In the hopes of establishing a more productive performance by plaintiff, Mr. Nichols and Ms. McCusker attempted to establish a more positive work relationship going forward. To this end, in September 2003, McCusker and Nichols gave plaintiff a positive evaluation while noting some perceived areas of concern to be addressed. Mr. Nichols and Ms. McCusker had hoped that a positive evaluation would encourage plaintiff to work harder and become more of a team player. In keeping with this goal, plaintiff was told she

5

would get a raise. However, when Human Resources learned of this, it rejected the raise because the raise was inconsistent with the prior work performance issues that plaintiff had with the company. As an accommodation to plaintiff, the company decided to give her a bonus in lieu of the raise.

The fourth quarter of 2003 was an extremely busy time of year, with a mid-November SEC filing deadline resulting in a number of time-sensitive matters that had to be addressed by the accounting staff. In October 2003, plaintiff expressed her unwillingness to spend more than 40 hours at work, no matter how much work had to be completed. She also continued to spend excessive time on the telephone and e-mailing on personal matters, took long lunches, left the office when there was additional work to be done, and repeatedly failed to meet deadlines. The plaintiff was unreceptive to constructive criticism.

The relationship between plaintiff's supervisors (Ms. McCusker and Mr. Nichols) and plaintiff deteriorated significantly. Ms. McCusker had to give plaintiff lists of work with deadlines for each task. She also had to maintain daily contact with plaintiff about completing the assignments on time. On a number of occasions, plaintiff failed to complete her work by the assigned deadline and refused to spend additional time to complete her assignments in timely fashion. Toward the end of October, 2003, Christopher Nichols met with plaintiff and discussed these issues with her. Plaintiff was generally passive whenever these issues were discussed and gave the impression that she was not interested in making any effort to address the issues.

In November, 2003, plaintiff's counsel wrote The Berkshire Group alleging that plaintiff was being harassed due to her pregnancy and had been given additional work. Plaintiff's attorney also requested that The Berkshire Group afford plaintiff all benefits that she was entitled

to under the Family and Medical Leave Act. The Berkshire Group and its counsel responded to this letter and the company fully complied with the FMLA requirements.

Plaintiff left on maternity leave in February, 2004 and returned on April 30, 2004. Again, plaintiff was paid her full salary, pursuant to the Berkshire Group's maternity leave policy. As soon as plaintiff returned, issues immediately arose relating to her commitment and willingness to work more than 40 hours per week. During the first week after she returned, plaintiff failed to meet the deadlines that had been set for her assignments. Kelly McCusker informed plaintiff that they would have to work late one evening to complete a project. Shortly thereafter, plaintiff stormed into Ms. McCusker's office and told her that she would not work more than 40 hours per week and would not stay late. Ms. McCusker could no longer tolerate the situation and told Chris Nichols that either the plaintiff be terminated or Ms. McCusker would resign. In light of these developments, the company terminated plaintiff's employment on May 13, 2004, as a result of plaintiff's insubordination, her history of failing to meet deadlines, the poor work quality and attitude, lack of commitment to completing her work assignments in a timely fashion, and the inordinate amounts of time she spent taking extended lunches and making personal phone calls and e-mailing friends.

The evidence will show that plaintiff was looking to work in her words as a "glorified book keeper" with pre-set hours and was unwilling to make a commitment to work productivity to meet the demands of her changed position. Throughout her employment with the Berkshire Group, plaintiff spent an inordinate amount of time on the phone and e-mailing family and friends on personal matters, and took hour long lunches when she was only supposed to take 45 minutes. In personal e-mail after e-mail that plaintiff sent to friends during business hours,

plaintiff discussed her co-workers and employer in disparaging terms and generally ridiculed her co-workers.

The evidence will also show that plaintiff had begun looking for another job while she was still employed at the Berkshire Group, as early as 2002. Additionally, after she was terminated, plaintiff made a voluntary decision not to start a new job until September 2004. When she interviewed with accounting placement agencies, plaintiff only sought part-time work, as opposed to full-time work. Part-time work was desirable for the plaintiff so she would have a more flexible schedule to care for her children. The evidence will show that plaintiff's desire to work part-time resulted in plaintiff's refusal to commit to performing full-time duties at the Berkshire Group, which in turn, forced the Berkshire Group to terminate plaintiff's employment.

Plaintiff failed to mitigate her damages when she made the decision to return to part time work, rather than full time work. She claims that she has been unable to obtain full time work since her termination and therefore claims ongoing lost wages of approximately $20,000 per year. Any claim for future lost earnings, however, is without merit, in light of the evidence that she was looking for a part time job rather than a full time job after her termination. Plaintiff told her employment agency that she was looking for "mother's hours." Additionally, although plaintiff seeks damages for alleged emotional distress, she has never sought any psychological treatment whatsoever in connection with this case.

At last report, plaintiff was working part-time as a temporary accountant at Riso, Inc., in Danvers. She was placed at this position through Winter, Wyman & Company, a staffing firm that offers permanent, contract and contract-to-permanent staffing in accounting and other professional fields. Plaintiff works between 22 to 24 hours per week for Riso doing general

accounting work and special projects as assigned.  She has been at this placement for one year. This is consistent with her desire to work "mother's hours."

(b)    Established Facts

1)    The plaintiff was employed by the defendants from September, 1999 through May 13, 2004.

2)    The defendants terminated the plaintiff's employment on May 13, 2004.

3)    The plaintiff resumed working in a part-time position in September 2004.

(c)    Contested Facts

The parties contest virtually all material facts  related to the plaintiff's claims and her allegations of pregnancy discrimination and retaliation and as to the defendants' defenses.  The defendants dispute that they said or did anything discriminatory or that they retaliated against the plaintiff.  The Berkshire Group contends that it terminated the plaintiff's employment solely because of issues relating to her poor work performance and attitude, her repeated failure to meet deadlines, lack of commitment to completing her work assignments, and the excessive amounts of time plaintiff took for lunch, and making personal phone calls and e-mailing friends and relatives.

(d)    Jurisdictional Issues

None.

(e)    Pending Motions

There are no pending motions.  The parties intend to raise the issues related or to file evidentiary motions with respect to their objections to exhibits described in paragraph (m) below.

(f)    <u>Issues of Law</u>

The only issues of law relate to evidentiary issues to be determined within the parties' evidentiary motions described in paragraph (m) below.

(g)    <u>Requested amendments to pleadings</u>.

Since the Berkshire Group is the umbrella entity for the various entities named as defendants, for simplicity, the parties have agreed to named the Berkshire Group as the only defendant, conditioned on a written stipulation of facts.  Accordingly, upon reaching such stipulation, the parties will seek that the caption be revised to Katerina Librizzo v. The Berkshire Group.

(h)    <u>Additional matters</u>

None.

(i)    <u>Probable length of trial.</u>

Four days.

(j)    <u>List of witnesses</u>

For the plaintiff:

   1. Katerina Librizzo
     49 Sylvanus Wood Lane
     Woburn, Mass.

   2. Bernadette Fernandes
     95 Wood Avenue

Hyde Park, Mass.

The above two individuals are fact witnesses.

3.    Keeper of records witnesses necessary to admit any records identified herein.

4.    The plaintiff reserves the right to call Christopher Nichols, Kelly McCusker and Daniel Stravinski, for the purpose of autheneticating and/or providing foundation documents to which the defense has objected, to the extent that the objections are so based.

5.    The plaintiff may read selections from the deposition of Kelly McCusker to the jury, pursuant to Rule 32.  Ms. McCusker is a fact witness.

For the defendants:

1.    Christopher Nichols, 65 Lake Shore Drive South, Westford, Massachusetts;

2.    Kelly R. McCusker, 3007 Barkley Gate Lane, Fairfax, Virginia;

3.    Wayne Zarozny, 14 Jasper Street, Westboro, MA 01581;

4.    Dan Stravinski, 15 Wilde Road, Wellesley, Massachusetts;

5.    John Callahan, 15 Smith Street, Medford, Massachusetts;

6.    Timothy Bolduc, 32 Maplewood Street, Watertown, Massachusetts

7.    Jaronid Jimenez, 66 Saint James Place, Unit 210, Roxbury, MA 02119

8.    Melissa Morris, 51 Dunvegan Road, Tewksbury, MA 01876

9.    Marlena Federici, 37 Dolphin Ave, #2, Winthrop, MA 02152

(k)    <u>Joint List of Exhibits.</u>

1.    Plaintiff's federal tax returns and W-2 forms for 2002-2005.
2.    Plaintiff's pay stubs for 2006.
3.    9/13/02 letter from Marlena Federici to plaintiff regarding FMLA leave.
4.    7/22/02 human resources notes relative to meeting with plaintiff (subject to parties agreeing upon appropriate redaction).
5.    8/18/03 payroll change form.
6.    11/7/03 e-mail exchanges between Dan Stravinski, Kelly McCusker and Chris Nichols.
7.    11/10/03 letter from Marlena Federici to plaintiff regarding FMLA leave.
8.    10/24/03 doctors restriction note.

11

9.    9/2/99 letter from Berkshire confirming employment.
10.   9/21/00 performance appraisal.
11.   9/21/01 performance appraisal.
12.   9/11/02 self performance appraisal.
13.   1/30/03 memo from Wayne Zarozny to plaintiff
14.   9/21/03 performance appraisal.
15.   10/14/03 memo (handwritten) from Dan Stravinski.
16.   10/22/03 memorandum from Chris Nichols to plaintiff.
17.   10/24/03 memorandum from plaintiff.
18.   10/22/03 e-mail exchanges between plaintiff, Kelly McCusker, Chris Nichols and Dan Stravinski.
19.   10/23/03 e-mail exchanges between plaintiff, Kelly McCusker, Chris Nichols and Dan Stravinski.
20.   10/24/03 e-mail exchanges between plaintiff, Kelly McCusker, Chris Nichols and Dan Stravinsky.
21.   10/27/03 e-mail exchanges between plaintiff, Kelly McCusker and Chris Nichols.
22.   10/29/03 e-mail exchanges between plaintiff, Kelly McCusker, Chris Nichols and Dan Stravinsky.
23.   10/30/03 e-mail exchanges between plaintiff, Kelly McCusker, Chris Nichols and/or Dan Stravinsky.
24.   (2) Memoranda dated 10/30/03 from Kelly McCusker and Chris Nichols to personnel file and Dan Stravinsky.
25.   10/30/03 memorandum from Dan Stravinski to plaintiff.
26.   11/7/03 e-mail exchanges between plaintiff, Kelly McCusker, Chris Nichols and Dan Stravinsky.
27.   11/10/03 e-mail exchanges between plaintiff, Kelly McCusker, Chris Nichols and Dan Stravinski.
28.   11/11/03 e-mail exchanges between plaintiff, Kelly McCusker, Chris Nichols and Dan Stravinski.
29.   2003-2004 FMLA used time memorandum.
30.   11/5/03 FMLA application and certification. 1/29/04 FMLA application and certification
31.   2/4/04 e-mail exchange between Chris Nichols and Kelly McCusker
32.   2/16/04 memorandum from Chris Nichols to plaintiff.
33.   2/18/04 memo from plaintiff to Chris Nichols.
34.   5/5/04 e-mail from Kelly McCusker with attached Senior Accountant job description ("List of deliverables").
35.   Senior Accountant job description
36.   5/6/04 e-mail from Kelly McCusker
37.   4/6/04-5/7/04 e-mail exchanges between plaintiff and Kelly McCusker.
38.   5/11/04 e-mail from Chris Nichols re: vacation "black out" dates.
39.   5/12/04-5/13/04 e-mail exchanges between plaintiff and Kelly McCusker.
40.   5/12/04 termination memo.
41.   5/13-5/14/04 e-mails exchanges between Kelly McCusker, Chris Nichols and Dan Stravinski.
42.   5/13/04 e-mail exchanges between plaintiff and Marlena Federici.

43.    4/5/04 Job Posting.

44.    2/19/04 letter from Marlena Federici to plaintiff regarding FMLA leave.

45.    9/13/02 payroll change form.

46.    Job posting for Senior Staff Accountant - Portfolio Yield Tracking/Sarbanes-Oxley/ Internal Audit position at Berkshire Group;

47.    Berkshire Group Employee Handbook;

48.    September 21, 2000 Memo from Chris Nichols to Katerina Librizzo Personnel file, & Wayne Zarozny re "2001 Review Goals" List of established goals for Katerina Librizzo in 2001;

49.    September 2000 Annual Evaluation of Katerina Librizzo;

50.    September 2002 Annual Evaluation of Katerina Librizzo;

51.    September 2003 Annual Evaluation of Katerina Librizzo;

52.    Copy of Quarterly filing for Berkshire Income Realty, Inc. for the three months ending September 30, 2003, prepared by Ms. Librizzo with supervisor's corrections and notations;

53.    October 22, 2003 e-mail from Katerina Librizzo to Chris Nichols & Kelly McCusker discussing Katerina Librizzo's ability to work enough hours to complete work assignments;

54.    October 22, 2003 Memo from Chris Nichols to Katerina Librizzo, Kelly McCusker, Personnel File, & Dan Stravinski concerning Katerina Librizzo's problems with meeting deadlines and her inability or unwillingness to commit sufficient hours to meet deadlines and options regarding her employment;

55.    October 22, 2003 e-mail exchange between Katerina Librizzo and Kelly McCusker discussing Katerina Librizzo's ability to work enough hours to complete work assignments, and McCusker ultimately saying she would do Librizzo's work on the quarterly report that was due;

56.    October 27, 2003, e-mail from Kelly McCusker to Katerina Librizzo re assigned tasks;

57.    October 29, 2003, e-mail from Kelly McCusker to Katerina Librizzo re status of work to be completed;

58.    October 30, 2003 Memo from Kelly McCusker to Personnel File, Dan Stravinski and Chris Nichols re "Katerina Librizzo Work Hour's;"

59.    October 30, 2003 email from Dan Stravinski to Katerina Librizzo confirming doctors note re working only 40 hours per week with explanation of overtime as essential function of a Senior Accountant position;

60.    October 30, 2003 Memo from Kelly McCusker to Personnel File, Dan Stravinski and Chris Nichols re "Katerina Librizzo's Work Performance in Relation to Q3;"

61.    October 30, 2003 Memo from Dan Stravinski to Katerina Librizzo re her request to work a reduced workload;

62.    November 10, 2003 Letter confirming Katerina Librizzo's notification of family leave with explanation of employees rights and responsibilities regarding family leave;

63.    May 12, 2004 Memo from Chris Nichols and Kelly McCusker to Personnel File & Dan Stravinski re "Katerina Librizzo's Termination" containing detailed history of events leading to Katerina Librizzo's 's termination;

64.    S-11 Prospectus for Berkshire Income Realty, Inc; and

65.    Katerina Librizzo's personnel file.

66. May 13, 2004 e-mail from Katerina Librizzo to Laura Merry, stating that Librizzo was not sure what was going on but that Scott had been pulled out of a meeting and asking Merry to destroy the e-mail.

67. May 13, 2004 e-mail from Katerina Librizzo to Siobhan Lynch discussing Dan meeting with Librizzo's two other supervisors;

68. May 12, 2004 e-mail from Katerina Librizzo to Siobhan Lynch stating that Librizzo being nice to one of her supervisors must be "pissing [the supervisor] off. hehe.";

69. May 12, 2004 e-mail string between Katerina Librizzo and Siobhan Lynch in which Librizzo refers to Kelly McCusker as "an idiot" and discussing how Librizzo would like to "bust [McCusker's] balls;"

70. May 12, 2004 e-mail from Katerina Librizzo to Siobhan Lynch asking Lynch to call Librizzo;

71. May 12, 2004 e-mail string between Katerina Librizzo and Siobhan Lynch in which Librizzo discusses not liking that Mark and Kelly have become friends because she tells Mark about how she thinks Kelly is fat and ugly and how Librizzo doesn't like her;

72. May 11, 2004 e-mail string between Katerina Librizzo and Siobhan Lynch in which Lynch asks Librizzo which of Librizzo's co-workers does Librizzo dislike the most and in which Librizzo discusses an e-mail she received from Chris regarding vacations and how Librizzo responded politely, and how that probably annoyed her supervisors and how she "swears  [her supervisors] must get off on this shit;"

73. May 11, 2004 e-mail from Katerina Librizzo to Lisa Tammaro asking her to call Librizzo.

74. May 10, 2004 e-mail from Katerina Librizzo to Sharon Ward asking Ward to call Librizzo;

75. May 10, 2004 e-mail from Katerina Librizzo to Siobhan Lynch in which Librizzo tells Lynch that she would love to slap both of her supervisors, how much she dislikes being at work and commenting how her leaving the job was going to happen very soon;

76. May 7, 2004 e-mail from Kelly McCusker to Katerina Librizzo agreeing with Librizzo that Sarbanes Oxley is not part of her job responsibilities;

77. May 7, 2004 e-mail from Katerina Librizzo to "Lisa" forwarding earlier e-mail exchange between Kelly McCusker and Katerina Librizzo re Ms. Librizzo not meeting deadlines;

78. May 6, 2004 e-mail exchange between Kelly McCusker and Katerina Librizzo re Ms. Librizzo missing deadlines;

79. November 4, 2003 letter from Sol Cohen to Dan Stravinski;

80. March 13, 2003, e-mail exchange between Katerina Librizzo to Christina Reale discussing BIR 10-K, and questions Reale had regarding errors in the BIR 10-K;

81. March 14, 2003 email from Katerina Librizzo to Christina Reale discussing BIR 10-K;

82. March 17, 2003 email from Christina Reale to Katerina Librizzo discussing changes to BIR 10-K;

83. March 18, 2003 Katerina Librizzo to Christina Reale discussing changes to BIR 10-K;

84.    Work product of Katerina Librizzo which was Exhibit #18 to the September 2, 2005, deposition of Katerina Librizzo;

85.    Work product of Katerina Librizzo which was Exhibit #20 to the deposition of Katerina Librizzo;

86.    Work product of Katerina Librizzo which was Exhibit #21 to the deposition of Katerina Librizzo;

87.    October 24, 2003 Facsimile from MGH Obstetric Associates which was Exhibit #27 to the deposition of Katerina Librizzo;

88.    October 29, 2003 Email from Katerina Librizzo to Chris Nichols, Kelly McCusker, & Dan Stravinski discussing Katerina Librizzo inability to work overtime;

89.    October 30, 2003 Email from Dan Stravinski to Kelly McCusker discussing Katerina Librizzo's work performance;

90.    October 29, 2003, e-mail string between Katerina Librizzo and Chris Nichols re status of work to be completed and why certain tasks were not finished by the set deadlines;

91.    October 30, 2003, e-mail string between Dan Stravinski and Kelly McCusker re Katerina Librizzo's work performance issues in which McCusker notes she is in the process of writing up a memo that McCusker would like to send to Dan Stravinksi for his review;

92.    October 30, 2003, e-mail string between Dan Stravinski and Kelly McCusker re document that McCusker forwarded to Stravinsky and Chris Nichols on October 30, 2003, entitled "Katerina.doc" and marked confidential;

(l)    <u>List of Exhibits to be Offered at Trial</u>

Plaintiff's proposed exhibits:

a.    Plaintiff's MCAD charge.
b.    Defendant's MCAD position statement with attachments.
c.    Letter dated 11/4/03 from Attorney Sol Cohen to Berkshire, with fax cover sheet and confirmation page dated 11/6/03.
d.    11/7/03 letter from Attorney Scott Spelfogel to Attorney Sol Cohen.
e.    11/7/03 letter from Attorney Sol Cohen to Attorney Scott Spelfogel.
f.    11/10/03 letter from Attorney Sol Cohen to Attorney Scott Spelfogel with attachments.
g.    11/7/03 letter from Attorney Scott Spelfogel to Attorney Sol Cohen (containing fax signature with date of 11/10/03).
h.    7/22/02 human resources notes relative to meeting with plaintiff.
i.    8/14/02 doctor's restriction note.
j.    9/11/02 doctor's restriction note.

Defendant's proposed exhibits:

k.    Plaintiff's Answers to Interrogatories;
l.    Account Pros computer screen print outs regarding telephone conversations with Katerina Librizzo dated May 18, 2005 and June 21, 2005;

m.   Winter Wyman Computer screen print out regarding Katerina Librizzo with entries dated May 27, 2004 to January 19, 2006;

n.   Beacon Hill Staffing records regarding Katrina Librizzo and marked as Exhibit 2 to Mr. Bolduc's Deposition of April 6, 2006;

o.   November 7, 2006, email string between Chris Nichols, Katerina Librizzo and Kelly McCusker, re work deadlines that Katerina Librizzo was expected to meet.


(m)  Remaining Objections to Evidence Identified in Disclosures

Plaintiff's objections:

The following objections correspond numerically to the defendants' pre-trial disclosure list of proposed exhibits:

23.   Document: May 6, 2004 e-mail exchange between Katerina Librizzo and Mark Faron discussing an unidentified female employee who is "like an animal probably" and how its difficult to imagine how she does "the other thing" when she has difficulty just getting into her car.

Objection: Plaintiff objects to admission of the substance of the communication under Rules 402 and 403. Although the fact that the plaintiff e-mailed her friend (Mark Faron) during business hours about a personal matter (and the time spent doing so) is relevant, the substance of the communication is not relevant to any claims or defenses in this action. Any probative value of the substance of the communications in these e-mails is substantially outweighed by the danger of unfair prejudice to the plaintiff and confusion of the issues, especially given that part of the e-mail exchange was initiated by Mr. Faron.

_Defendant's Position_:  This document is directly relevant to a number of issues in this case. Defendant contends that it terminated plaintiff's employment based on plaintiff's history of failing to meet deadlines, poor use of work time and unproductivity, poor work quality and attitude, lack of commitment to completing her work assignments in a timely fashion, failure to be a team player, and the inordinate amounts of time she spent on personal matters including the time she spent e-mailing friends.  Plaintiff contends that "[these] reasons [we]re false and [we]re a pretext for discrimination on the basis of gender and pregnancy." (Complaint at ¶ 42). She further contends that these reasons were false, and were a pretext for its retaliation on account of and because of the plaintiff's protected activity." (Complaint at ¶ 32).  This e-mail shows how the plaintiff was spending her time at work.  It directly supports defendant's articulated, legitimate, and non-pretextual reasons for terminating plaintiff's employment, namely, that (1) plaintiff was spending excessive time on personal matters during business hours; (2) that plaintiff was unable to manage her time, and frequently failed to meet deadlines, and; (3) that she exhibited a poor attitude at work.  Plaintiff's personal e-mails, the length of the e-mails, and the frequency of the personal e-mails are directly relevant to the crucial issue of whether defendant's articulated reasons for terminating plaintiff's employment were legitimate or pretextual.

Additionally, during her deposition, plaintiff testified that she liked and respected all of the other workers on the floor where she worked, including Laura Murray. When confronted with this e-mail in particular, plaintiff identified the female in the e-mail as her co-worker, Laura Murray. There were other similar e-mails in which plaintiff denigrated her co-employees. Thus, the e-mail and its content goes to plaintiff's credibility and whether, in fact, she has testified truthfully about the work place.

Further, plaintiff has alleged a claim for emotional distress, claiming that as a result of defendant's discrimination and retaliation, she has suffered "emotional distress and anguish of mind" and therefore, seeks to recover damages for her alleged emotional distress. By making this claim, plaintiff has placed her emotional and psychological condition at issue. The content and tenor of plaintiff's personal e-mails, and particular, those e-mails where she is complaining about work, or ridiculing her co-workers and her employer are directly relevant to plaintiff's state of mind, and whether she was suffering "emotional distress and anguish of mind." The email reveals how the plaintiff perceived her workplace and the fact that plaintiff is joking about the workplace and co-employees (who were not involved in the alleged discriminatory acts) rebuts her claim of suffering severe emotional distress as a result of the actions of the defendants. The e-mail constitutes an admission by plaintiff as to her perception of the workplace.

26.    Document: May 12, 2004 e-mail exchange between Katerina Librizzo and Lisa Tammaro re Librizzo not staying late and work and Tammaro recommending Librizzo just continue to say she has an appointment every time she is asked to stay late.

Objection: Plaintiff objects to admission of the substance of the communication under Rules 402 and 403. Although the fact that the plaintiff e-mailed her sister (Lisa Tammaro) during business hours about a personal matter (and the time spent doing so) is relevant, the substance of the communication is not relevant to any claims or defenses in this action. Any probative value of the substance of the communications in these e-mails is substantially outweighed by the danger of unfair prejudice to the plaintiff and confusion of the issues, especially given that part of the e-mail exchange was initiated by Ms. Tammaro.

*Defendant's Position:* As with the previous e-mail, this document is highly relevant to whether defendant's articulated reasons for terminating plaintiff's employment were legitimate or whether, as plaintiff claims, they were a pretext for discrimination and retaliation. Here, one of the primary reasons that defendant terminated plaintiff's employment, was because of her lack of commitment and willingness to work more than 40 hours per week. This e-mail is also relevant to plaintiff's claim that defendant made "unreasonable demands" on plaintiff based on her pregnancy and her engagement in protected activity, by "requiring unlimited and unreasonable over time" of plaintiff. Whether plaintiff was legitimately unable to stay after 5:30 to help with time-sensitive projects, or whether she was claiming to have an appointment every time she was asked to stay late, bears directly on the merits of plaintiff's lawsuit. The e-mail is also probative of plaintiff's calculating nature and credibility.

31.    <u>Document</u>: May 11, 2004 e-mail string between Katerina Librizzo and Siobhan Lynch in which Librizzo discusses hating everyone on her floor at work and how "Shannon kisses everyone's ass".

    <u>Objection</u>: Plaintiff objects to admission of the substance of the communication under Rules 402 and 403. Although the fact that the plaintiff e-mailed her friend (Ms. Lynch) during business hours about a personal matter (and the time spent doing so) is relevant, the substance of the communication is not relevant to any claims or defenses in this action. Any probative value of the substance of the communications in these e-mails is substantially outweighed by the danger of unfair prejudice to the plaintiff and confusion of the issues.

*Defendant's Position:* Once again, this document is relevant to the plaintiff's perception of the workplace and whether her discontent arose from the alleged discrimination of other factors. The email is also relevant to whether defendant's articulated reasons for terminating plaintiff's employment, were legitimate or whether, as plaintiff claims, they were a pretext for discrimination and retaliation. This e-mail bears directly on defendant's contention that plaintiff was spending excessive time on personal matters during business hours, and exhibited a poor attitude at work. Plaintiff's personal e-mails, the length of the e-mails, and the frequency of the personal e-mails are directly relevant to the crucial issue of whether defendant's articulated reasons for terminating plaintiff's employment were legitimate or pretextual. This is particularly true in regards to this document, as it represents a string of e-mails that extended over a period of time.

This e-mail is also relevant to the issue of plaintiff's credibility as it conflicts with plaintiff's testimony that she liked and respected all of her co-workers at the Berkshire Group. It is also probative of plaintiff's emotional state of mind and rebuts her claimed emotional distress. The email constitutes an admission by plaintiff related to her work conditions.

32.    <u>Document</u>: May 10, 2004 e-mail from Katerina Librizzo to Siobhan Lynch entitled "that little troll over her[e] is so fake I want to puke" in which Librizzo discusses her dislike for Lynch's replacement and sightings she made at work of Lynch's then-boyfriend.

    <u>Objection</u>: Plaintiff objects to admission of the substance of the communication under Rules 402 and 403. Although the fact that the plaintiff e-mailed her friend (Ms. Lynch) during business hours about a personal matter (and the time spent doing so) is relevant, the substance of the communication is not relevant to any claims or defenses in this action. Any probative value of the substance of the communications in these e-mails is substantially outweighed by the danger of unfair prejudice to the plaintiff and confusion of the issues.

*Defendant's Position:*
This e-mail is also relevant to whether defendant's claim that some of the reasons it terminated plaintiff's employment was for her unproductive use of time and poor attitude, are legitimate reasons. It is also relevant to the issue of plaintiff's credibility as it again conflicts with plaintiff's testimony that she liked and respected all of her co-workers and was happy at the Berkshire Group, aside from the alleged discrimination. It is also probative of her emotional state of mind.

37.    Document: May 4, 2004 e-mail from Katerina Librizzo to Siobhan Lynch in which Librizzo states that "Sue and Shannon" are "so chipper it's disgusting and fake" and that everyone at work bothers her.

Objection: Plaintiff objects to admission of the substance of the communication under Rules 402 and 403.  Although the fact that the plaintiff e-mailed her friend (Ms. Lynch) during business hours about a personal matter (and the time spent doing so) is relevant, the substance of the communication is not relevant to any claims or defenses in this action.  Any probative value of the substance of the communications in these e-mails is substantially outweighed by the danger of unfair prejudice to the plaintiff and confusion of the issues.

*Defendant's Position:*
This e-mail is also relevant to whether defendant's claim that some of the reasons it terminated plaintiff's employment was for her poor attitude and unproductive use of time, are legitimate reasons.  It is also relevant to the issue of plaintiff's credibility as it again conflicts with plaintiff's testimony that she liked and respected all of her co-workers, and was happy at the Berkshire Group, aside from the alleged discrimination.  It is also probative of her emotional state of mind.

39.    Document: May 7, 2004 e-mail string from Katerina Librizzo to Siobhan Lynch in which Librizzo comments on Berkshire staff and complains about her husband.

Objection: Plaintiff objects to admission of the substance of the communication under Rules 402 and 403.  Although the fact that the plaintiff e-mailed her friend (Ms. Lynch) during business hours about a personal matter (and the time spent doing so) is relevant, the substance of the communication is not relevant to any claims or defenses in this action.  Any probative value of the substance of the communications in these e-mails is substantially outweighed by the danger of unfair prejudice to the plaintiff and confusion of the issues.

*Defendant's Position:*
Like the other e-mails above, this e-mail is again relevant to whether defendant's claim that some of the reasons it terminated plaintiff's employment was for her poor attitude and unproductive use of time, are legitimate reasons.  It is also relevant to the issue of plaintiff's credibility as it again conflicts with plaintiff's testimony that she liked and respected all of her co-workers at the Berkshire Group.  It is also probative of her emotional state of mind.

It is also important to note that the frequency of the foregoing e-mails directly supports the defendant's position of plaintiff unproductive use of her work time.

50.    Document: Plaintiffs Answers to Interrogatories.

Objection: Plaintiff objects to the extent and that she objected (and on the grounds on which she so objected) to each individual objection and to the extent that she has since supplemented her Answers.

19

*Defendant's Position:* Defendant does not intend to introduce Plaintiff's Answers to Interrogatories into evidence as an exhibit. Defendant may, however, read certain answers to the jury.

52.    Document: Account Pros computer screen print outs regarding phone conversations with Katerina Librizzo dated May 18, 2005 and June 21, 2005.

Objection: Plaintiff objects pursuant to Rule 802 because these documents contain two levels of hearsay.

*Defendant's Position:* These documents would be admissible as business records under Rule 803(6) and as an admission of a party opponent under Rule 801(2). Additionally, defendant is prepared to call as a witness a representative of Account Pros who is qualified to verify the authenticity of the documents.

54.    Document: Beacon Hill Staffing records regarding Katerina Librizzo and marked as Exhibit 2 to Mr. Bolduc's deposition of April 6, 2006.

Objection: Plaintiff objects pursuant to Rule 802 because these documents contain two levels of hearsay.

*Defendant's Position:* These documents would also be admissible as business records under Rule 803(6) and as an admission of a party opponent under Rule 801(2). Additionally, defendant has identified a representative of Beacon Hill Staffing, Timothy Bolduc, as a potential witness, who is qualified to verify the authenticity of the documents.

Defendants' objections:

Documents (l)(a) and (l)(b) Complaint plaintiff filed with the MCAD and the Berkshire Group's MCAD position statement with attachments.

Objection:  Pursuant to the Magistrate Judge's Order of October 20, 2006, defendants' request that the MCAD complaint was found to be moot.  However, plaintiff has identified the document as an exhibit to be offered at trial.  To the extent the Magistrate Judge no longer considers the issue to be moot, Berkshire Group objects to the admission of the MCAD complaint and the defendants' position statement and attached documents on the grounds that their admission would be confusing to the jury and would be more prejudicial than probative, constitute hearsay, and cumulative and unnecessary evidence and should therefore be excluded. As set forth in the Berkshire Group's Motion in Limine, incorporated by reference herein, the plaintiff withdrew her MCAD complaint in order to file suit in this Court.  Given that the MCAD never even considered the complaint, it seems evidence of the complaint, in addition to the hearsay, would be probative of nothing.  Moreover, given that the MCAD complaint contains mere allegations and mirrors the complaint plaintiff filed in the instant action, evidence of the MCAD complaint would be cumulative.  Finally, evidence of the MCAD complaint would be confusing to the jury and serve no purpose other than for plaintiff to unfairly have the opportunity to repeat the allegations set forth in her district court complaint.  Accordingly, the

MCAD complaint, the Berkshire Group's position statement and attachment and any reference to plaintiff's MCAD case, should be excluded as irrelevant, more prejudicial than probative and potentially confusing the jury.

    *Plaintiff's position:* The defendant's MCAD position statement is a statement of a party, signed by the defendants, directly relevant to the claims and defenses in this action.


### Documents (l)(c), (l)(e) and (l)(f)

    Plaintiff also identified in her trial disclosure, various letters prepared by her attorney, Sol Cohen, that were prepared prior to her leaving the Berkshire Group.

    Objection:

    The Berkshire Group objects to the admission of these documents on the grounds that the documents qualify as first and second level hearsay given that Mr. Cohen will not be testifying at trial and has no first hand knowledge of the events, further on the ground that such evidence is cumulative and self-serving. In addition, there is no foundation for the admission of the letters.

    *Plaintiff's position:* The documents are not hearsay because the plaintiff does not seek to introduce them for the truth of the matters asserted in them. Rather, the documents and the defendant's receipt of them are relevant to the plaintiff's claims for retaliation.


### Documents (l)(d) and (l)(g)

    Plaintiff identifies two letters from the Berkshire Group's general counsel, Scott Spelfogel, as documents that she may introduce at trial.

    Objection:

    The Berkshire Group notes that these letters may not be relevant depending upon the Court's rulings on the foregoing objections. Further, the letters may require sanitizing depending upon the Court's other evidentiary rulings.


    Documents (l)(i) and (l)(j)  Doctor restriction notes dated August 14, 2002 and September 11, 2002

    Objection: Defendant objects to the admission of these documents on the grounds that they are irrelevant. Both documents concern notes that a doctor wrote with regards to plaintiff's *first* pregnancy. Issues regarding defendant asking plaintiff to work more than 40 hours arose during plaintiff's second pregnancy.

Document (l)(h) Human Resources Notes from July 22, 2002

Objection:  Defendant objects to the admission of this document on the grounds it has not

been authenticated and should not be admitted under the hearsay rule.  Defendant further

objects to the admission of the full three-page document, and requests that, to the extent

the court finds the document admissible, the document be sanitized to exclude the second

page of the document which has no bearing on this matter and pertains to matters outside

of this lawsuit.

Respectfully submitted,

For the plaintiff,                              For all defendants,

Sol J. Cohen   /s/                    Joseph H. Aronson     /s/
Sol J. Cohen                          Joseph H. Aronson
BBO # 630776                          BBO # 022070
COHEN & SALES                         THE MCCORMACK FIRM
43 Thorndike Street                   One International Place
Cambridge, MA 02141                   Boston, MA 02110
(617) 621-1151                        (617) 951-2929