UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

KATERINA LIBRIZZO,
                    Plaintiff

v.                                                            CIVIL ACTION
                                                         NO. 05 CV 10918MLW
THE BERKSHIRE GROUP,
Defendant.

**THE BERKSHIRE GROUP'S OPPOSITION TO PLAINTIFF'S MOTION FOR A NEW TRIAL**

   **I.    INTRODUCTION**

   In her Rule 59 motion for a new trial, plaintiff argues that a new trial is warranted on the ground that the Judge's "instructions to the jury omitted a material principal of law that was critical to the jury's application of the law of retaliation to the facts of the case." Plaintiff's argument is without merit for a number of reasons. First, counsel for plaintiff failed to properly preserve his objection under F.R.C.P. Rule 51, to the allegedly erroneous jury instruction. Although counsel initially explained his basis for the objection, after further discussion, counsel was persuaded by the Court, and consented to the Court's proposed instruction, thereby waiving the objection to the instruction. Second, assuming for the sake of argument that counsel for plaintiff did not waive the objection to the retaliation jury instruction, the instruction as given was a proper statement of the law. The addition that had been proposed by plaintiff (but then abandoned) does not accurately reflect the law on retaliation and the Court's instruction as a whole properly instructed on retaliation. Finally, even if the Court erred by not including the proffered addition to the retaliation instruction, which defendant expressly denies, such error was harmless. Accordingly, plaintiff's motion for a new trial should be denied.

II.  **BACKGROUND**

Plaintiff, Katerina Librizzo, filed suit against The Berkshire Group, a company where she worked in the past.  She alleged that the defendant discriminated against her on account of her pregnancy and engaged in retaliation, and ultimately terminated her because of her gender and pregnancies.  The Berkshire Group denied that it discriminated against the plaintiff and argued that the plaintiff was terminated for legitimate non-discriminatory reasons, including poor work performance and attitude, repeated failure to meet deadlines, poor work product, and excessive amount of times spent on personal matters.  The matter was tried before a jury, and lasted five days.  On November 17, 2006, the jury found for the Berkshire Group on all counts and judgment was entered in the Berkshire Group's favor on November 30, 2006.

Plaintiff now seeks a new trial on the grounds that the Court's jury instruction for retaliation under Title VII and M.G.L. Chapter 151B should have stated that the element of "protected activity" includes seeking a modified work schedule as a result of pregnancy.  The retaliation instruction proposed and ultimately given by the court follows:

> The law also prohibits an employer from retaliating against an employee because she has complained about an unlawful employment practice. Specifically, the law provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees... because [she] has opposed any practice made an unlawful employment practice." Ms. Librizzo claims that the Berkshire Group unlawfully retaliated against her because she complained about what she believed to be discriminatory practices in the workplace.

> Ms. Librizzo claims that the Berkshire Group retaliated against her by terminating her employment because she complained that she was subjected to pregnancy discrimination. In order to prove her retaliation claims, Ms. Librizzo must demonstrate the following three elements by a preponderance of the evidence:

>> First, she must show  that she engaged in protected conduct by complaining about discrimination and/or retaining an attorney;

2

Second, Ms. Librizzo must show that she suffered an adverse employment action; and

Third, she must prove that the adverse employment action occurred because she complained about discrimination.

The law of retaliation necessarily requires a plaintiff to prove that she experienced an adverse employment action after she engaged in protected activity. However, I cautioned you that mere fact that an adverse employment action occurred after a complaint does not necessarily prove that the two events were casually connected. A plaintiff must prove that the adverse employment action was actually caused by the plaintiff's complaint about discrimination.

At the Charge Conference, counsel for the plaintiff sought to expand upon the protected conduct element by adding that "seeking a modified work schedule due to pregnancy is a 'protected activity.'"   In the motion, plaintiff quotes from the portion of the transcript in which he argues for the addition to the instruction.   However, notably absent for plaintiff's motion is the portion of the transcript where counsel for plaintiff is persuaded by the court that the addition is unfounded, and abandons the objection.   Below, is the exchange that occurred after counsel for the Berkshire Group objected to the additional language on the grounds that seeking a restriction or accommodation because of pregnancy is not a protected activity because by seeking the modified schedule, she was not invoking a right to be free from discrimination.

THE COURT: It seems like she has a point about that Mr. Cohen.  It seems like –I mean, if they did something because of that, that's discrimination because of pregnancy, that would arguably be gender discrimination, right?  And – but how is that retaliation?

MR. COHEN: Well, what I'm getting at, just to make it more concrete as to this case, is that the evidence has been that on October 29 she e-mails them and says, "I need a restriction according to my doctor," and then the next morning they write these warning memos which include threats of termination.   And whether she's invoking some right or doing some protected activity by e-mail where she notified them that she needed a restriction or whether she's seeking to protect her pregnancy and then is treated differently as to the terms and conditions as a result –

3

THE COURT: I mean, isn't that more equivalent to her being -- if, in fact, the facts as you suggest, and the jury agrees with your assessment of the fact, that the jury just -- that they just discriminated against her at that moment. She said basically -- it's no different -- I mean, than -- but what if she applied for -- what if she had been doing something, they didn't realize that she was a woman, and then she announced she's a woman and then they immediately took adverse employment action against her? It's not retaliation, it's discrimination, right?

MR. COHEN: **Well, yeah. I see the point. Yeah, I suppose -- I suppose, you know, from my perspective I can handle that argument.** At the closing is what I --

(See Full Transcript from Charge Conference held on November 16, 2006,

attached as Exhibit A).

Counsel for plaintiff did not raise the protected activity/pregnancy related request for a

modified work schedule again at the Charge Conference nor did he raise any objection after the

Court provided the instructions to the jury. (See, Transcript from argument of counsel held at

sidebar on November 17, 2006, after the Judge had Charged the Jury).  Counsel for plaintiff did

however argue repeatedly during closing argument, that the Berkshire Group discriminated against

plaintiff as soon as she gave the doctors note regarding modification of her work schedule to her

supervisors.  The following are quotes taken from the transcript of plaintiff's closing argument:


This case is about a woman's right to have her pregnancy be her first priority. It's about retaliation as well. It's about angry retaliation: Getting back at somebody for asserting their rights to be free from discrimination.

. . .

When Ms. McCusker and Mr. Nichol's, the day after the -- the very morning after she tells them about a doctor's note that she has that restricts her to 40 hours, the very next morning they write her -- bang, they write her these warning memos threatening her termination. That's a violation of her right to have her baby -- her unborn baby and her pregnancy be her first priority.

(Excerpt of Day 5 of Jury Trial, p. 4, lines 2-6 and lines 19-25, attached as exhibit B).

During those first two years she got a great review: In September of 2000; she got a great review in September 2001. She got raises in both of those years. Think

4

about broadly, how does an employee like that suddenly turn into a monster? And even in September 2003 she's still doing very well. That was before she got later into her pregnancy and needed time for prenatal appointments and a lesser ability to be able to work into the evening as she got into the later stages of her pregnancy because she was tired and hungry. So take a look at the timeline because the very next day, bang, as soon as she tells them that she needs a restriction pursuant to her doctor for her pregnancy, they write these two warnings.

(Id. at p. 7, lines 11-24, attached as exhibit B).

October 29the she asserts her rights for -- she gives them a doctor's note. She tells them by e-mail on October 29th that she's got this doctor's note, you know, enough is enough. Enough of this, you know, you can't work, you can't work, you can't do the job. Enough of this. "I've got a doctor's note, let's put this thing to bed. I'm only going to work 40 hours. Here's my doctor's note."

And what do they do? Bang. The next morning Kelly McCusker writes this single spaced warning memo threatening her with termination. Chris Nichols -- they got together and Chris Nichols does the same thing. October 30th, 2003. And they told you they were angry. They were angry about her need for a restriction or asserting her rights.

I mean, they thought -- they thought it was going to be easy to just get rid of her. Just a paper that -- put on paper that now the job requires overtime, bang, she -- knowing she can't do it, they thought she would leave, and they were angry once she didn't. They were angry because she needed the restriction and they couldn't -- they couldn't get rid of her at that point in time.

(Id. at p. 18, lines 1-23, attached as exhibit B).

## II.    ARGUMENT

### A.    Plaintiff Waived Any Objection to the Retaliation Instruction By Assenting to the Court's Proposed Instruction and Therefore the Standard of Review Applicable to Plaintiff's Motion for a New Trial is "Plain Error"

Plaintiff moves for a new trial on the basis that the Judge's "instructions to the jury omitted a material principal of law that was critical to the jury's application of the law of retaliation to the facts of the case."   The threshold issue here, however, is whether plaintiff properly preserved her objection to the instruction.   Whether plaintiff properly preserved the objection determines the

standard of review used by the Court in deciding plaintiff's motion for a new trial.  See, Play Time,
Inc. v. LDDS Metromedia Communications, Inc., 150 F.3d 1, 6 (1ˢᵗ Cir. 1997).

In order to preserve an objection to a jury instruction, the moving party must have complied
with Fed. R. Civ. P., Rule 51.  Rule 51 provides in pertinent part:

> No party may assign as error the giving or the failure to give an
> instruction unless that party objects thereto before the jury retires to
> consider its verdict, stating distinctly the matter objected to and the
> grounds of the objection.

Fed. R. Civ. P., Rule 51.

Here, the transcript of the charge conference includes a discussion about whether the Court
should give the jury a retaliation instruction which included seeking a modified work schedule
because of pregnancy as an example of "protected activity."  In that discussion, counsel for plaintiff
took the position that "as it applies to this case, seeking a restriction because of a pregnancy can
be protected activity as it relates to retaliation."  The Court replied that it believed that any adverse
action the Berkshire Group took against plaintiff, after she gave them the doctor's note seeking a
modified work schedule, would be discrimination based on gender but not retaliation.  Counsel for
plaintiff then agreed, stating "Well, yeah. I see the point. Yeah, I suppose -- I suppose, you know,
from my perspective I can handle that argument."  Counsel for plaintiff did not raise the issue again,
and nor did he assert this objection after the Court charged the jury.

Rule 51 is satisfied so long as the objection is sufficient to call the error to the district court's
attention.  See, Beatty v. Michael Business Machines, Corp., 172 F.3d 117, 121 (1ˢᵗ Cirt. 1999)
(internal citations omitted).  Here, counsel for plaintiff assented to the court's proposed instruction
on retaliation, leaving the Court with the impression that he was satisfied with the instruction in its
proposed form.  Accordingly, plaintiff failed to comply with Rule 51.  See, Greene v. Safeway
Stores, Inc., 210 F.3d 1237, 1245 (10th Cir. 2000) (party's acceptance of the district court's
proposed instruction and silence in the face of the district court's resolution of the issue does not

comply with Rule 51). If a party complies with Rule 51, then a harmless error standard of review applies. <u>Beatty v. Michael Business Machines, Corp.</u>, 172 F.3d at 121. But if a party fails to comply with Rule 51, the standard of review that governs is plain error. <u>Id.</u> Under that standard, any error in the instruction will only be remedied where the error is plain or obvious and affects substantial rights. However, here, under either standard, the Court's use of its proposed retaliation jury instruction which was clear and legally correct, in no way warrants a new trial.

### B.    Plaintiff's Proposed Addition to the Retaliation Instruction Does Not Accurately Reflect the Law

The law on retaliation is well established. To state a claim for retaliation under Title VII and the Massachusetts anti-discrimination statute, the plaintiff must prove that: (1) she engaged in protected conduct; (2) she was subject to an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. <u>Bourbeau v. City of Chicopee</u>, 445 F.Supp.2d 106 (2006).

What conduct qualifies as "protected activity" is described in 42 U.S.C. § 2000e-3, under the heading "Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings." That provision makes it "an unlawful employment practice" for an employer to discriminate against any of his employees "because he has opposed any practice made an unlawful employment practice by this title [42 USCS §§ 2000e-2000e-17], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title [42 USCS §§ <u>2000e</u>-2000e-17]." Similarly, Mass. Gen. Laws ch. 151B, § 4(4) makes it "unlawful for an employer to discriminate because the employee opposes practices forbidden by the law, and specifically makes it unlawful for an employer "to coerce, intimidate,

threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter . . ."

In her motion for a new trial, plaintiff does not contend that the instruction as given misstated the law on retaliation.  Her argument instead is that "in this case" the instruction should have included this element.   This argument fails.

So long as a jury instruction sets forth "the proper legal standards to be applied by lay jurors in determining the issues that they must resolve in a particular case . . . the court's choice of language is largely a matter of discretion." Febres v. Challenger Caribbean Corporation, 214 F.3d 57, 62 (1st Cir. 2000) (citing United States v. DeStefano, 59 F.3d 1, 2 (1st Cir. 1995)).   While a party has a right to a jury instruction on her theory of the case, the theory must be legally correct. Febres, 214 F.3d at 62.   Thus, there is no error where the Court declines the party's request for a further instruction, where the additional instruction is misleading or legally incorrect.  Id.

Here, there was no error in the Court's decision to decline to add to the retaliation instruction, the language proposed by plaintiff pertaining to seeking a pregnancy related work modification as constituting a "protected activity" for retaliation claim purposes under Title VII and M.G.L. 151B, as there is no legal authority to support the addition of such language.  None of the cases cited in plaintiff's motion hold or even suggest that a request for an accommodation qualifies as a protected activity under Title VII or M.G.L. 151B for retaliation claim purposes.  In each of the cases relied upon by plaintiff involving pregnancy-related absences, or requests made for modified work schedules, the issue is whether the subsequent adverse employment action taken by the employer was caused by the employee's request for the accommodation and whether the action constituted gender discrimination, not whether it constituted retaliation.   The issue was the same here, namely, did Ms. McCusker and Mr. Nichols' preparation of the warning memos threatening

8

plaintiff with termination after she gave them a doctor's note modifying her work schedule, constitute discrimination.

In an effort to overcome the complete lack of case law to support the proposed addition to the retaliation instruction, plaintiff seeks to expand pregnancy discrimination law and invites the Court to analogize handicap discrimination cases involving requests for reasonable accommodation where the request has been found to qualify as a "protected activity" under the ADA's retaliation provision.    Handicap discrimination law under the ADA, is quite different and controlled by two distinct statutory schemes that serve different purposes.  In the context of handicap discrimination cases, it has been found that requesting an accommodation under the ADA "is no less a guarantee under the ADA, than the right to file a complaint with the EEOC." Wright v. CompUSA, Inc., 352 F.3d 472, 477 (1st Cir. 2003) (internal citations omitted).  However, there is no similar guarantee under Title VII and M.G.L. 151B.    Simply put, seeking a work modification related to pregnancy cannot be considered a form of opposition to an unlawful employment practice for purposes of retaliation claims brought under Title VII or the Massachusetts anti-discrimination statute. Accordingly, the Court did not err in declining to include plaintiff's proposed addition to the retaliation instruction, and hence, plaintiff's motion for a new trial should be denied.

**C.    Even If the Instruction as Given was Erroneous, Which Defendant Expressly Denies, the Error Was Harmless**

Even if the objected-to retaliation instruction were somehow found to be erroneous, any such error was harmless.  As noted above, in his closing argument, counsel for plaintiff referred on multiple occasions to the Berkshire Group reacting to plaintiff giving them the doctor's note pertaining to the 40 hour work week, by writing two warning memos threatening plaintiff with termination immediately after she told her supervisors about her note from her doctor limiting her to a 40-hour work week.  In effect, counsel for plaintiff was arguing that the Berkshire Group

9

discriminated against plaintiff by treating her request for a modified schedule, differently than had she not been pregnant.  The jury could not have found that the Berkshire Group's alleged negative reaction to plaintiff seeking a modified work week because of her pregnancy amounted to retaliation without also finding that it amounted to discrimination.  The jury was not persuaded that the Berkshire Group had discriminated against plaintiff as a result of her giving them a doctor's note seeking a pregnancy related work modification or retaliated against her in response to her allegedly asserting her rights to be free from discrimination.  There is no reason to believe the jury would have reached a different conclusion had the Court adopted the retaliation instruction proposed by plaintiff.

**III.    CONCLUSION**

For the foregoing reasons, plaintiff's motion for a new trial should be denied.

Respectfully submitted,
Defendants

By their attorneys,

Joseph H. Aronson [BBO #022070]
Laura G. Ryan      [BBO #653793]
**The McCormack Firm, LLC**
One International Place - 7th Floor
Boston, MA    02110
Ph:  (617) 951-2929

92150.1

10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                         )
KATERINA LIBRIZZO,       )
                         )
         Plaintiff,      )
                         )   Civil Action
v.                       )   No. 05-CV-10918-LTS
                         )
THE BERKSHIRE COMPANIES  )
LIMITED PARTNERSHIP,     )
d/b/a THE BERKSHIRE GROUP,)
                         )
         Defendant.      )
                         )
```

BEFORE:  The Honorable Leo T. Sorokin,
Magistrate Judge

JURY CHARGE CONFERENCE

John J. Moakley United States Courthouse
Courtroom No. 14
One Courthouse Way
Boston, Massachusetts  02210
Thursday, November 16, 2006
4:40 p.m.

Marcia G. Patrisso, RPR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3507
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

Page 2

```
1  APPEARANCES:
2
      COHEN & SALES
3      By: Sol J. Cohen, Esq.
       43 Thorndike Street
4      Cambridge, Massachusetts  02141
       On behalf of the Plaintiff
5
      THE McCORMACK FIRM, LLC
6      By: Joseph H. Aronson, Esq.
         Laura G. Ryan, Esq.
7      One International Place
       Boston, Massachusetts  02110-0140 LLP
8      On behalf of the Defendant
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1  before we go into the specifics, the way I did this, as
2  you could see, is I instructed the jury just as to the
3  law of discrimination, of the law of retaliation,
4  without regard to the difference -- any differences
5  between Massachusetts and federal law.  And I did that
6  because my understanding from both of you, and my sense
7  of the case, was that to the extent that there are
8  differences, those differences aren't material to this
9  case.  And the only --
10      So I wondered, do you both generally agree with
11  that approach?  There may be things to tweak as to a
12  point here or there, or is that an approach you don't
13  agree with?
14      MR. COHEN:  I generally agree with that.
15      THE COURT:  All right.
16      MR. COHEN:  I don't think there are any material
17  differences on these claims as to -- as between Title 7
18  and 151B.  I do have some --
19      THE COURT:  Specific things I understand.  But
20  as a general approach, that part you don't have a
21  problem with?
22      MR. COHEN:  No.
23      THE COURT:  All right.  How about you, Mr.
24  Aronson?
25      MR. ARONSON:  I'm going to let Miss Ryan --
```

Page 3

```
1      THE CLERK:  Librizzo versus The Berkshire Group,
2  Civil Action No. 05-10918, will now be heard before this
3  Court.
4      Will counsel please identify themselves for the
5  record.
6      MR. COHEN:  Good afternoon, your Honor.  Sol
7  Cohen here for the plaintiff.
8      MR. ARONSON:  Joseph Aronson for the defendant,
9  your Honor.
10      THE COURT:  Good afternoon.
11      MS. RYAN:  Laura Ryan for the defendant as well.
12      THE COURT:  Good afternoon.  All right.  So
13  everything's perfect, you're happy, and we can all go
14  home.  Why don't we do this:  I guess, Mr. Cohen, you're
15  the plaintiff.  Do you have any issues, and if you do,
16  tell me with what.
17      MR. COHEN:  Okay.  I do have some issues.
18      THE COURT:  All right.
19      MR. COHEN:  The first one is on the liability
20  relative to discrimination charge.
21      THE COURT:  The elements of the discrimination
22  charge?
23      MR. COHEN:  Correct.
24      THE COURT:  Let me ask you both first a
25  big-picture question.  And before we get to -- and
```

Page 5

```
1      THE COURT:  I'm sorry.
2      MR. ARONSON:  -- handle that portion of it, your
3  Honor.
4      MS. RYAN:  No, we have no -- generally, we find
5  that using one set of instructions for both sets of
6  claims to be agreeable.
7      THE COURT:  All right.  Let me raise one or two
8  things.  There is a cap under federal law with respect
9  to certain categories of damages.  I can't recall off
10  the top of my head, frankly, and I haven't had an
11  opportunity to look.  Is there such a cap under state
12  law?
13      MR. COHEN:  No, there's no cap under state law.
14      THE COURT:  Okay.
15      MR. COHEN:  And even under the -- even had there
16  been only a Title 7 claim --
17      THE COURT:  The cap would only apply to the
18  emotional distress-type claim.  That type of damages?
19      MR. COHEN:  Right.  That's correct.  And my best
20  memory is that we don't charge the jury about the cap,
21  we simply let them --
22      THE COURT:  No, I wasn't going to charge them.
23  I'm more thinking:  Suppose they return a verdict in
24  your favor, and suppose that the amount of money
25  exceeded the cap, whatever it is in this case -- I
```

Page 6

1  haven't calculated the number of employees -- what to
2  do? And I suppose the answer is: Since there's no cap
3  under state law, that -- since we're not asking them to
4  allocate, if it went over, what is the federal cap? You
5  get the benefit of that, because you can get it all
6  under state law.
7      MR. COHEN: That is my position, yes.
8      THE COURT: What about that?
9      MS. RYAN: Your Honor, we would argue that the
10  plaintiff had a choice between filing in state court or
11  federal court, and he filed in federal court.
12      THE COURT: So is it your position that the --
13  but he could be heard on the state claim in federal
14  court, and we have jurisdiction over that. And are you
15  arguing the cap in Title 7 is procedural such that
16  when adjudicating a state law claim in federal court, we
17  would apply that cap?
18      MS. RYAN: No, your Honor. I'm arguing that if
19  we're going to combine the two sets of claims, that
20  there's benefits and burdens. There's good things and
21  bad things for both parties, and it's going to be one of
22  the not so good things for Mr. Cohen.
23      MR. COHEN: We're not combining -- I mean, my
24  understanding is that by doing this, the instruction
25  this way and giving one set of instructions for both

Page 7

1  federal and state claims, we're not combining the claims
2  so that now there's only one --
3      THE COURT: Whatever the verdict is, the
4  verdict -- what I was thinking is that if there's a
5  verdict, say, of no discrimination, then the judgment
6  would be judgment in favor of the defendant on both of
7  the discrimination claims; likewise, if there's a
8  judgment of discrimination in favor of the plaintiff,
9  then judgment would enter in favor of the plaintiff on
10  both of the discrimination claims. That's what I was
11  thinking.
12      MS. RYAN: I would argue, your Honor, and I
13  would request that -- and I would appreciate Mr.
14  Aronson's opinion on this, but I would argue that if
15  that's the course we're going to take, then we might as
16  well break them all down and set forth the four separate
17  claims, and if he succeeds on the state claim --
18      THE COURT: Then charge them separate. And in a
19  special verdict, we have: Was there discrimination
20  under state law? If so, what's the damages; and then
21  under federal law, what's the damages?
22      MS. RYAN: Yes, your Honor.
23      THE COURT: So then suppose they thought that
24  the damages were half a million dollars. They might
25  award half a million on the state law claim and half a

Page 8

1  million on the federal claim, and he would get 800,000
2  and it's a $300,000 cap. That would be the risk that
3  you'd be running.
4      MR. ARONSON: Your Honor, I think, then, maybe
5  as a practical matter, I think under the state law we
6  don't even come near the cap in terms of what would be
7  enforceable and --
8      THE COURT: I'm not sure that there's a big --
9  this may be somewhat of a hypothetical discussion in
10  terms of the reality.
11      MR. ARONSON: I think so. And we have here
12  garden variety emotional distress, and there are some
13  very clear state cases on that, recent cases, in terms
14  of what could be awarded for that. And that doesn't
15  come anywhere near the cap.
16      THE COURT: Well, what I'm really just trying to
17  do is, so we're all clear, not have, after the verdict,
18  an unanticipated disagreement over how to treat it. My
19  suggestion is -- but I'm open -- is it seems to me that
20  it's simpler -- I mean, the jury's heard evidence of
21  discrimination and evidence of nondiscrimination, and it
22  is for the jury to decide what happened. If need be,
23  I'm prepared to charge them somewhat, but it seems
24  unduly complicated to explain to them or to have --
25  either to explain separately discrimination/retaliation,

Page 9

1  if it's unnecessary, separately under federal and
2  separately under state law, and then similarly have
3  special verdict questions, strikes me to create a large
4  amount of complication.
5      It seems to me the better course is to charge it
6  as I've laid out. It's simpler, it's clearer, there
7  aren't any material differences that you raise, and the
8  judgment is the judgment on both, and the number is the
9  number on both, but there's no double recovery; that is,
10  if they award X in damages, all's the award on -- that's
11  the generalized award. And I think the -- if it's --
12  and my inclination would be, unless someone showed me
13  case law to the contrary, that in that situation if it
14  went over the federal cap but was under -- there isn't
15  any statutory cap, but what you're suggesting is that
16  there's state law as to sort of how much could be
17  appropriately awarded, we agree there would be a motion
18  to reduce the jury verdict.
19      MR. ARONSON: Yes, absolutely.
20      THE COURT: And if that were the case, then it
21  would be reduced under the state law, and if it weren't
22  reduced because it's permissible and there's no cap, he
23  gets it all under that without regard to the federal.
24      MS. RYAN: That sounds fine, your Honor.
25      THE COURT: Okay. All right. The only other

Page 10

```
 1   question that I wanted to bring up, and then I'll let
 2   you, Mr. Cohen, go ahead with your issues, is that
 3   punitives are not available under federal law, I don't
 4   think, unless there's an award of compensatory damages.
 5   And I think that means in this context, compensatory
 6   means back pay or emotional distress like...
 7       I invite you to tell me if there's a similar
 8   restriction under state law. If there is, it's easy;
 9   it's the same. If there isn't, tell me about it now.
10       MR. COHEN: I am not aware of any similar
11   restriction under state law. But to be perfectly frank,
12   I haven't actually briefed or researched the issue
13   recently. But I'm certainly not aware of any similar
14   restrictions. So, you know, that may very well be one
15   area where we may need --
16       THE COURT: I'm not sure we would need -- I
17   think the question would become not so much a separate
18   instruction, but just taking it out. If that's the
19   case, I could take out in the verdict form the
20   limitation that, "If your answer is no to the question
21   has she suffered damages, don't proceed any further," on
22   the theory that if they say "no" as to damages, then
23   tell them to proceed to the punitive damages questions.
24   And if they award punitive damages, it wouldn't be
25   awarded under the federal claim, they'd only
```

Page 11

```
 1   be awarded -- we would deem them only awarded under the
 2   state law, and then you could have whatever post-trial
 3   motions you want to file.
 4       What do you think of that?
 5       MS. RYAN: Well, I would actually backtrack and
 6   renew our motion for the directed verdict on the issue
 7   of punitive damages, and this would make our argument
 8   moot. As we understood it, your Honor was taking that
 9   under advisement.
10       THE COURT: I know. And that will moot it out.
11   And I'll either do -- I'll do something about it before
12   the closing arguments. I'll tell you my inclination --
13   I assume you're pressing the punitives?
14       MR. COHEN: Absolutely; yeah.
15       THE COURT: Okay. My inclination is not to take
16   it from the jury. It may not be the strongest case for
17   punitive damages, but it seems to me that the wiser
18   course is to give everything to the jury, and then any
19   legal issues that are raised thereafter I can sort out
20   thereafter with the benefit of the jury verdict, and
21   then if somebody disagrees with me, the jury verdict has
22   been rendered and we'll have them.
23       So absent you hearing anything else from me, I'm
24   not going to take the punitives from the jury. And my
25   thought would be to modify the special verdict, unless
```

Page 12

```
 1   you tell me that you can't get punitives under state
 2   law.
 3       MS. RYAN: I'm not aware of any.
 4       MR. ARONSON: I don't think you can, your Honor.
 5       THE COURT: All right.
 6       MR. ARONSON: There is a state case, the Labonte
 7   case. It doesn't address that specifically, but it says
 8   one of the factors that's considered is the ratio of the
 9   punitive damage award to the actual harm inflicted on
10   the plaintiff. And in this case if there is a
11   determination that there's no compensatory damage, I
12   would suggest that there's no basis for an award of
13   punitive damages.
14       MR. COHEN: That's not a restriction, that's a
15   factor to consider.
16       THE COURT: You're saying the amount.
17       MR. COHEN: Right. What the compensatory
18   damages were. If they award 10,000 --
19       THE COURT: I think this is what I would do on
20   that: That's how, based on -- that's how I would
21   interpret that statement from that case that you read to
22   me, Mr. Aronson. What I would say is on Question 3, "If
23   the answer is yes, which is, 'Have you suffered any
24   damages,' please answer Question 4." And then they'll
25   go to Question 5, which is, "Is she entitled to
```

Page 13

```
 1   punitives." If the answer is no to Question 4, then
 2   what I'll say is, "Please proceed to Question 5." Then
 3   they may say no damages, no punitives. They may say no
 4   damages, yes, punitives, and then I'll resolve the
 5   question of whether the ratio is appropriate or anything
 6   else based on the amount. And then we'll see where we
 7   are.
 8       MR. ARONSON: Well, I would object to having an
 9   instruction on punitives. I will do a little more
10   research this evening in terms of whether it's permitted
11   under state law if there's no compensatory damage.
12       THE COURT: All right.
13       MR. ARONSON: And I'd like to be able to address
14   that tomorrow morning or at some point before your
15   charge.
16       THE COURT: Sure. So I suppose that's two
17   issues: One is, if there's punitives, go to the jury;
18   as to punitives right now, I'm going to allow it to go
19   to the jury. And as the record stands, I'm not going to
20   enter a directed verdict on the punitives now.
21       The -- if you want to further research the
22   question, and if there's support for the position that
23   under state law if there's no punitive -- if there's no
24   compensatory damages, then there can be no punitives,
25   bring it to my attention, I'll look at it and we could
```

Page 14

1  modify the special verdict form. And if we did that, if
2  it's clear under both claims, then I suppose it would
3  make sense in the instructions to then add a sentence or
4  two that say -- before the preparatory part of the
5  punitives, something similar to the damages, you don't
6  get to this unless there's some sort of compensatory
7  damages.
8      But absent you showing me something to that
9  effect, I would leave it the way it is and just say,
10  "Please proceed to Question 5," and we'll just see what
11  they say about it.
12      MR. ARONSON: Okay. I just wanted to note my
13  objection to the punitive damages going to the jury. I
14  don't want to give a long argument because I think you
15  made up your mind, to a large degree, based on a number
16  of factors. But under the Kolstad case and the Browning
17  case in Massachusetts and its progeny of cases, we would
18  suggest that the facts as introduced by plaintiff, in
19  the most favorable light to plaintiff, would not satisfy
20  the standard for --
21      THE COURT: If you want give me copies of those
22  cases -- do you have copies here, or citations?
23      MR. ARONSON: I don't have copies here but I
24  would be happy to give you citations.
25      THE COURT: Sure. What's Kolstad?

Page 15

1      MR. ARONSON: It's 527 U.S. 526.
2      THE COURT: All right. And what's the other
3  one?
4      MR. ARONSON: Do you have the Browning case?
5      MS. RYAN: Sorry, your Honor.
6      THE COURT: That's all right.
7      MS. RYAN: It's Dartt versus Browning-Ferris
8  Industries, Incorporated. That's 427 Mass. 1 (1998).
9      THE COURT: Okay. All right. Mr. Cohen, what
10  are your issues?
11      MR. COHEN: Okay. Just since we just finished
12  with that, if we find tomorrow that there is no
13  restriction under 151B to punitive damages where there
14  are no compensatory, I think we need -- we would need to
15  modify the punitive damage instruction because we have,
16  "If you have not awarded compensatory damages to Ms.
17  Librizzo, you may not award punitive damages."
18      So if I'm -- in other words, if I'm right --
19      THE COURT: In other words, I've already got the
20  language in here, is that if under Mass. law you can't,
21  as well, the way it is tracked in federal law.
22      MR. COHEN: Yes.
23      THE COURT: All right. So if I determine that
24  under Mass. law, based upon what people say, you can't
25  get punitives without compensatory damages, then I would

Page 16

1  leave the instruction on punitives the way it is. Would
2  you agree with that?
3      MR. COHEN: That's agreeable.
4      THE COURT: All right. If -- and then the
5  special verdict form would say, "If your answer to
6  Question 3 is no, then don't proceed any further." If
7  you can get it, it would say, "Go to Question 5," and
8  then I would change this -- I'd just delete that
9  sentence, I suppose.
10      MR. COHEN: Right. That's my understanding.
11      THE COURT: Okay. Anything else?
12      MR. COHEN: Yes. We're seeking in the elements
13  of pregnancy discrimination, and specifically, as it
14  relates to intent, that there be some instruction as
15  to -- I think there's a line of cases, essentially, that
16  rule that -- or hold that an employer may not
17  necessarily be aware of his or her bias. I'll just read
18  straight out from -- and this was --
19      THE COURT: What do you want me to say?
20      MR. COHEN: Essentially, an employer may not
21  necessarily be aware of his or her bias. Employment
22  decisions that are made because of stereotypical
23  thinking about people because of their gender or
24  pregnancy violates the Massachusetts law prohibiting --
25  or violates the law prohibiting discrimination.

Page 17

1      THE COURT: What about that?
2      MR. ARONSON: I don't really think that applies
3  here, your Honor, in terms of the instruction.
4      THE COURT: What about it -- well, but this is
5  about -- you want this, Mr. Cohen, on page 9 in the
6  paragraph that begins, "Discrimination is, of course, a
7  matter of intent"?
8      MR. COHEN: Exactly, your Honor.
9      THE COURT: Do you have that language, so I can
10  just look at it, written down on something?
11      MR. COHEN: I do. You could just disregard my
12  handwritten notes there.
13      THE COURT: All right. I need to think about
14  how to craft something with the notion of saying
15  something about stereotypical thinking in that
16  paragraph. Either at the very end of the paragraph or
17  right before the last sentence makes sense.
18      Okay. What else?
19      MR. COHEN: On the instructions as to
20  retaliation, I essentially have two things: One is a
21  very specific thing and one is sort of a broader wording
22  of the elements. But first, the instructions as written
23  seem to limit the protected activity to only complaints
24  of discrimination. So, for example, on line -- I'm
25  sorry, page 11, the second paragraph, "First she

Page 18

1 must" -- as to the elements, "First she must show that
2 she engaged in protected conduct by complaining about
3 discrimination."
4        And my position is that it's a lot broader than
5 that -- or somewhat broader than that. That it should
6 be protected activity; in other words, if they retaliate
7 against her because of some protected activity which may
8 not just be limited to a complaint of discrimination --
9        THE COURT: You're saying I should say, "First
10 she must show she engaged in protected activity."
11       MR. COHEN: Yeah. And that leads to, I guess,
12 another point that: Should we define "protected
13 activity"?
14       THE COURT: How would you define it?
15       MR. COHEN: Well, "protected activity" in the
16 case law that I've read, and I apologize, I don't have
17 cites with me, but it can be -- "protected activity" can
18 be -- can be a report or a complaint of discrimination,
19 but it can also be retaining an attorney, it can be --
20 even as it applies to this case, seeking a restriction
21 because of a pregnancy can be protected activity as it
22 relates to retaliation.
23       And that's akin to cases in -- under the ADA and
24 disability discrimination laws where an employee
25 requests an accommodation for a disability and is then

Page 19

1 retaliated against. That can be both discrimination on
2 the basis of a disability and retaliation.
3        So our position is that we can include within
4 the definition of "protected activity" seeking or asking
5 for a restriction because of a pregnancy.
6        THE COURT: So you want me to say, "First they
7 must show that she engaged in protected activity," and
8 then second, third, then have something that says,
9 "protected activity is," and define it.
10       MR. COHEN: Yes. It may be a report or a
11 complaint of discrimination, it may be retaining an
12 attorney if it's known to the employer, or it may be
13 seeking a restriction because of the -- because of a
14 pregnancy. A restriction or an accommodation because of
15 a pregnancy.
16       THE COURT: What about that, Mr. Aronson or Ms.
17 Ryan?
18       MS. RYAN: Your Honor, if I may. I think that
19 the facts as they've been presented, the only thing
20 that's really occurred here is that there's a complaint.
21 I think that that adequately captures the protected
22 activity here.
23       THE COURT: Well, but she retained a lawyer.
24       MS. RYAN: But isn't that the same thing: She
25 intends to complain. Intends to file a complaint.

Page 20

1        As far as relying on ADA cases, first of all, I
2 don't believe that pregnancy would qualify as a
3 disability. And I appreciate that you're only using
4 those as an analogy, but I don't think they apply here.
5 Those are disability cases. An accommodation wasn't
6 made here. She asked to be limited to 40 hours of work
7 a week.
8        THE COURT: Suppose that she just said, "I want
9 to be limited to 40 hours a week, and here's my doctor's
10 note; because of my pregnancy, I can only work 40 hours
11 a week." And suppose that the evidence were that they
12 said, "Fine, but now we're going to take an adverse
13 employment action against you because you sought this --
14 because of your seeking this 40 hours a week."
15       MS. RYAN: But isn't that seeking to protect a
16 right that she has? That's not seeking to --
17       THE COURT: But don't you think -- well, doesn't
18 retaliation protect her also from invoking the rights
19 that she has, not just complaining about them? But she
20 has the right -- isn't she -- she's to be free from
21 discrimination. And doesn't the retaliation protect her
22 from not just -- not just the activity of complaining
23 about it but also invoking the --
24       MS. RYAN: I'm sorry. I don't see it, your
25 Honor. If you brought in a note for any kind of ailment

Page 21

1 that you had and you wanted reduced hours because of it
2 or, you know, some incapacity, you may have an ADA claim
3 but you don't have a gender discrimination claim.
4        THE COURT: You mean the retaliation is because
5 of the medical condition, not because of anything --
6 doesn't the definition of "gender" include pregnancy?
7        MS. RYAN: It does, but that's what I'm saying.
8 I don't believe pregnancy is considered a handicap. I'm
9 not sure that you can make that leap.
10       THE COURT: Well, forgetting about the
11 disability cases.
12       MS. RYAN: Sure.
13       THE COURT: What I'm saying is that if she
14 invokes her rights --
15       MS. RYAN: But she's not invoking her right to
16 be pregnant or a right to be free from discrimination;
17 she's relying on a doctor that's stated that she should
18 work only 40 hours.
19       THE COURT: Well, you don't disagree by saying
20 she engaged in protected activity, and then define the
21 protected activity; you're just saying the definition of
22 "protected activity" means filing a report of
23 discrimination or making a complaint of discrimination.
24       MS. RYAN: That would be fine. I don't see that
25 we need a definition. I think that your instruction is

Page 22

1  adequate as it is.
2       THE COURT: All right.
3       MS. RYAN: You give examples -- you give many
4  examples of protected activity. I'm not sure why the
5  need for an additional definition.
6       THE COURT: All right. Well, let me think about
7  that. It seems that retaining an attorney I see as sort
8  of very close to complaining but not exactly the same,
9  and it seems fair to -- I'm going to -- it seems to me
10 if she was retaliated against because she hired a
11 lawyer...
12      MS. RYAN: Retaining an attorney, we'd be fine
13 with that, your Honor.
14      THE COURT: Really the issue that you have is
15 with seeking a restriction or accommodation because of a
16 pregnancy.
17      MS. RYAN: Uh-huh.
18      THE COURT: It seems like she has a point about
19 that, Mr. Cohen. It seems like -- I mean, if they did
20 something because of that, that's discrimination --
21 because of a pregnancy, that would arguably be gender
22 discrimination, right? And -- but how is it
23 retaliation?
24      MR. COHEN: Well, what I'm getting at, just to
25 make it more concrete as to this case, is that the

Page 23

1  evidence has been that on October 29 she e-mails them
2  and says, "I need a restriction according to my doctor,"
3  and then the next morning they write these warning memos
4  which include threats of termination. And whether she's
5  invoking some right or doing some protected activity by
6  e-mail where she notified them that she needed a
7  restriction or whether she's seeking to protect her
8  pregnancy and then is treated differently as to the
9  terms and conditions as a result of it --
10      THE COURT: I mean, isn't that more equivalent
11 to her being -- if, in fact, the facts as you suggest,
12 and the jury agrees with your assessment of the fact,
13 that the jury just -- that they just discriminated
14 against her at that moment. She said basically -- it's
15 no different -- I mean, than -- but what if she applied
16 for -- what if she had been doing something, they didn't
17 realize that she was a woman, and then she announced
18 she's a woman and then they immediately took adverse
19 employment action against her? It's not retaliation,
20 it's discrimination, right?
21      MR. COHEN: Well, yeah. I see the point. Yeah,
22 I suppose -- I suppose, you know, from my perspective I
23 can handle that argument. At the closing is what I --
24      THE COURT: So I will just change this: "First
25 she must show that she engaged in protected conduct by

Page 24

1  complaining about discrimination and/or retaining an
2  attorney." What's next?
3       MR. COHEN: In the broader -- in the broader
4  point or position on the -- is that as -- generally as
5  to the elements of retaliation, what I had proposed
6  was -- let me first say, I don't really have an
7  objection to the description of "retaliation" that you
8  have, your Honor. I guess what I'm looking at is some
9  additional, I suppose, clarification on what the jury
10 has to find as far as elements.
11      What I'm looking for is something along the
12 lines of, "To prove retaliation or to win a claim of
13 retaliation, she must prove the following elements:
14 One, she engaged in conduct that Title 7 protects or
15 that the law protects; two, she suffered a material
16 adverse action by the defendants; and three, there's a
17 link between the protected expression and the
18 defendant's adverse action suggesting that the protected
19 expression was the cause of the adverse action."
20      And I --
21      THE COURT: Haven't I done that on page 11? "In
22 order to prove retaliation claims, Ms. Librizzo must
23 demonstrate the following three elements by a
24 preponderance: First, she must show that she engaged in
25 protected conduct by complaining of discrimination

Page 25

1  and/or retaining an attorney; second, she must show that
2  she suffered an adverse employment action; and third,
3  she must prove that the adverse employment action
4  occurred because she complained about discrimination."
5       MR. COHEN: Well, I guess it's the third element
6  that is my real -- I guess that's what I'm really
7  getting at, is the third element, I suppose. My
8  position is that the third element should read that
9  there's a link between the protected expression and the
10 defendant's adverse actions.
11      THE COURT: It should say, "Third, she must
12 prove that there is a link between the adverse
13 employment action and the complained-about
14 discrimination?"
15      MR. COHEN: That's my position, yes.
16      THE COURT: What's a link?
17      MR. COHEN: And there's some case law on that,
18 at least.
19      THE COURT: But what's a link?
20      MR. COHEN: Well, that there's a -- there's a --
21 there's a link, meaning that -- okay, I keep going back
22 to this.
23      THE COURT: I mean, it's basically you've got to
24 prove causation, and I think that's what Number 3 says.
25      MR. COHEN: I guess my impression, when I was

Page 26

1  reading that, I was reading -- what I'm looking for
2  under Element 3 is that there's somewhat -- I suppose in
3  a way it seems to be a lesser standard under this case
4  law saying that there's a link.  And I'll leave it at
5  that.
6        THE COURT:  All right.  Well, I don't -- I'm
7  disinclined to instruct them with the word "link"
8  because I think that -- I would think that the jury is
9  going to have the same question I have, which is,
10  "Exactly what does that mean?"
11        I think this instruction's clear; it
12  encapsulates the causation.  And link.  A link:  A
13  causal link?  A temporal link?  There's all kinds of
14  links.  Links about the same topic.  And I'm not sure
15  what that would mean, so I'm not going to -- as it
16  presently stands, I'm not going to change that to link.
17        Anything else?
18        MR. COHEN:  That is all, your Honor.  That's all
19  I have.
20        THE COURT:  Okay.  Ms. Ryan or Mr. Aronson?
21        MS. RYAN:  Your Honor, we just have a few
22  things.  On page 3 it talks about, "In a civil case, a
23  plaintiff has the burden of proving."
24        THE COURT:  Yup.
25        MS. RYAN:  "As I explained in my opening

Page 27

1  instructions, this is a much lower standard of proof
2  than proof beyond a reasonable doubt, the very high
3  standard that we apply in a criminal trial."  We would
4  ask that "much" and "high" be -- "very high" be removed.
5  Or excuse me.  "Very" would be fine in the second
6  sentence.  It just seems that too much emphasis is
7  being placed on -- it makes the standard sound too low.
8        So it would read, "As I explained in my opening
9  instructions, this is a lower standard of proof than
10  proof beyond a reasonable doubt, the high standard that
11  we apply in a criminal trial."
12        THE COURT:  Do you have anything to say about
13  that, Mr. Cohen?
14        MR. COHEN:  Yes, I do, your Honor.  Your wording
15  is exactly the state of the law.  I mean, the criminal
16  standard is a very high standard and the civil standard
17  is a much lower standard.  I mean, beyond a reasonable
18  doubt is a --
19        THE COURT:  I'm inclined to leave it.  I
20  understand your objection, but I think that it's a
21  commonly used instruction.  I think it's accurate as to
22  the state of the law, and I think the following
23  sentences explain exactly what it means to be proved
24  beyond a preponderance of the evidence.  And so I think
25  it's appropriate.

Page 28

1        MS. RYAN:  That's fine.
2        THE COURT:  Next?
3        MS. RYAN:  On page 8, the third full paragraph
4  down, "First, Ms. Librizzo must show."  The last
5  sentence, "She is also a member of a protected class if
6  she was pregnant."  We would suggest putting a period
7  there.  "Or experiencing pregnancy-related conditions at
8  the relevant times" I think would confuse the jury.  I
9  think that there hasn't been evidence presented that
10  talks about --
11        THE COURT:  What about that, Mr. Cohen?  The
12  fact of the matter is there's no dispute --
13        MR. COHEN:  Yeah, I don't have an objection to
14  striking that portion.
15        THE COURT:  All right.  So I'll just say, "She
16  was also a member of the protected class if she was
17  pregnant," period, and I'll strike "or experiencing
18  pregnancy-related conditions at the relevant times."
19        MS. RYAN:  The first full paragraph, "In this
20  case, Ms. Librizzo claims that after she became
21  pregnant, the Berkshire Group began a campaign of
22  discriminatory conduct."  That, to us, suggests some
23  sort of conspiracy, and I don't think that the evidence
24  plays out in that regard.  We would propose:  "The
25  Berkshire Group exhibited discriminatory conduct."

Page 29

1        THE COURT:  How about -- what if I said this:
2  "In this case Ms. Librizzo claims that after she became
3  pregnant, The Berkshire Group discriminated against her
4  by taking unsubstantiated..."  Is that all right with
5  you, Mr. Cohen?
6        MR. COHEN:  No problem on my end.
7        THE COURT:  In other words, just say, "The
8  Berkshire Group" -- "In this case, Ms. Librizzo claims
9  that after she became pregnant The Berkshire Group
10  discriminated against her."
11        MS. RYAN:  And then we would ask that the next
12  phrase be removed including "unsubstantiated
13  disciplinary actions."  We haven't seen any evidence of
14  that.  I'm not sure that that's occurred here or there's
15  any claims that that occurred here.  We would say that
16  it was enough to say that they discriminated against her
17  by requiring unreasonable work hours, harassing her
18  about her need for prenatal medical appointments and --
19        THE COURT:  They're not claiming they're
20  unsubstantiated disciplinary actions.  I mean, she's
21  claiming that she didn't get a raise because of her
22  pregnancy; that's hotly disputed and --
23        MS. RYAN:  I'm not sure that would be a
24  disciplinary action, though.  Maybe something
25  unfavorable that happened, though.

8 (Pages 26 to 29)

Page 30

1    THE COURT: What's the disciplinary action in
2  this case?
3    MR. COHEN: Well, as one example, there were two
4  October 30th warning memos which included threats of
5  termination that went into her personnel file. I mean
6  that's a concrete disciplinary action that she's
7  contending was not substantiated.
8    THE COURT: So it's a warning. What about that,
9  Ms. Ryan?
10    MS. RYAN: Preliminarily threatened with a
11  disciplinary action.
12    THE COURT: Well, threatened. But the fact of
13  putting a warning, isn't that a disciplinary action? So
14  it's an official warning of some form in her file.
15    MS. RYAN: That would be fine. Then the last --
16    THE COURT: So I'll just leave it,
17  "discriminated against her by" -- how about by
18  "allegedly"? How's that?
19    MS. RYAN: Good.
20    THE COURT: "Taking unsubstantiated disciplinary
21  actions, requiring unreasonable work hours."
22    "In addition, she was terminated."
23    MS. RYAN: We would make the same argument, your
24  Honor, about that last -- about the need for maternity
25  leave. I think the evidence that plaintiff's presented

Page 31

1  so far has to do with before the maternity leave and
2  after the maternity leave. I'm not sure that there's
3  been any evidence that there's been discrimination based
4  on her need for maternity leave.
5    THE COURT: How about if I change the sentence
6  to "The Berkshire Group discriminated against her by
7  allegedly" -- take out the "alleged" -- "by making
8  unsubstantiated disciplinary actions" -- "by taking
9  unsubstantiated disciplinary actions, requiring
10  unreasonable work hours, harassing her about her need
11  for prenatal medical appointments, and her maternity
12  leave. In addition, she was terminated"?
13    I don't know if it says that in your version.
14    MS. RYAN: It doesn't.
15    THE COURT: I was going to say, "In addition,
16  she was terminated." And then if I say, "The Berkshire
17  Group denies that it discriminated against her."
18    MS. RYAN: That would be fine.
19    THE COURT: Okay?
20    MR. ARONSON: Your Honor, I'm sorry, I didn't
21  catch the --
22    THE COURT: Let me read it -- I'll read it to
23  you again. "In this case, Ms. Librizzo claims that
24  after she became pregnant, The Berkshire Group
25  discriminated against her by taking unsubstantiated

Page 32

1  disciplinary actions, requiring unreasonable work hours,
2  harassing her about her need for prenatal medical
3  appointments, and her maternity leave. In addition, she
4  was terminated. The Berkshire Group denies that it
5  discriminated against her."
6    Next?
7    MS. RYAN: Two paragraphs down, "Discrimination,
8  is of course, a matter of intent."
9    THE COURT: Uh-huh.
10    MS. RYAN: The sentence, "Direct evidence can
11  consist of statements of a defendant related to the
12  plaintiff's claim that suggests a discriminatory
13  attitude towards pregnant women." That would seem like
14  indirect evidence. Here it would be direct evidence,
15  would have to be comments made about plaintiff;
16  discriminatory comments made about plaintiff as opposed
17  to pregnant women.
18    THE COURT: It's direct evidence of her state of
19  mind, though, right, which is what we're talking about
20  here.
21    MS. RYAN: But the comments would be -- or the
22  attitude would be about pregnant women in general as
23  opposed to the plaintiff?
24    THE COURT: Well, the comment, "I don't like
25  pregnant women," seems fairly insightful into somebody's

Page 33

1  state of mind. It seems fairly direct evidence of their
2  state of mind.
3    MS. RYAN: But here you're saying it has to be
4  an intentional act of discrimination, so I'm not sure --
5  it says the discriminatory attitude against pregnant
6  women. Nobody's intending to discriminate against
7  plaintiff if they're making a discriminatory comment
8  about pregnant women.
9    THE COURT: No, but it -- but statements of a
10  discriminatory attitude toward pregnant women would be
11  direct evidence of the defendant's state of mind and
12  would be relevant evidence to the question of whether
13  the treatment of her was driven by pregnancy
14  discrimination.
15    MS. RYAN: We would just note our objection,
16  your Honor.
17    THE COURT: All right.
18    MS. RYAN: And the last one: On page 10 there's
19  a typographical error.
20    THE COURT: Okay.
21    MS. RYAN: "Rather, it remains open to Ms.
22  Librizzo." I believe that should read "up to Ms.
23  Librizzo."
24    THE COURT: I'm sorry. "Rather, it remains."
25    MS. RYAN: "Open to." I think that should be

Page 34

1  "up to."

2      THE COURT: I see. Let me read the sentence.

3  Hold on.

4      (There is a pause.)

5      I understand what you're saying from a

6  grammatical perspective. I'm inclined to leave it

7  alone, if you don't have a strong objection, because it

8  strikes me there's a lot of different ways to prove

9  these things. And obviously, if the jury is persuaded

10  that, as I told them just before this, that the reasons

11  articulated by The Berkshire Group for doing what it

12  did, if they accept those as the reasons why it did what

13  it did, then you win. It's hard to imagine they won't

14  directly confront the question of: Is that true or not

15  true. So this is all a little academic. But I suppose

16  conceivably they could look at other evidence, draw --

17  and conclude it was because of discrimination and not be

18  satisfied that yours is the true answer, but not

19  necessarily draw an inference against you from it or not

20  necessarily make any conclusion about it, if you know

21  what I mean. It's a little bit theoretical.

22      MS. RYAN: Our argument would be here we're

23  talking about burden of proof that remains open. It

24  sounds like it's optional: "It remains."

25      THE COURT: I understand what you're saying, but

Page 35

1  I -- it also says that she must -- at the end of the

2  paragraph, that "she must show that the real reason for

3  the adverse employment action was discriminatory," and

4  I've just said in the sentence before that they don't

5  have the burden of persuading you that your reasons are

6  true.

7      So I've told them earlier that she has the

8  burden of proof on everything, and here I say, you put

9  forth an explanation, and if the jury believes it, you

10  win, but you don't have the burden of persuading

11  you that those reasons -- you don't have the burden of

12  persuading the jury those reasons are true. She can try

13  to persuade you that the explanation is contrived or

14  false. And if she -- if they disbelieve her

15  explanation --

16      So I don't think it's -- I don't think it shifts

17  the burden of proof. And given that sentence before and

18  the sentence at the end that she must show the real

19  reason it's discriminatory, and also preceding the

20  second-to-last sentence that even if they disbelieve

21  your reason -- if they disbelieve your reason, well,

22  that inference could be enough to support a verdict in

23  her favor only if given the totality she's proven

24  discrimination by a preponderance.

25      MS. RYAN: That's fine, your Honor.

Page 36

1      I believe that Attorney Aronson wanted to make a

2  point about punitive damages.

3      THE COURT: Okay.

4      MR. ARONSON: Those are the only -- the last

5  point is -- two final points, your Honor. On the

6  punitive damage instruction, obviously we object to that

7  instruction as referenced earlier.

8      But on page 15 it talks about malicious

9  indifference, or reckless indifference to her protected

10  rights to be free from discrimination. The language in

11  Kolstad is fairly clear as to what she has to -- it

12  does, certainly, include malicious or with reckless

13  indifference to federally protected rights under that --

14  under that case. It goes further, and we would suggest

15  that there should be some reference to conscious

16  indifference to the consequences or acting with

17  knowledge of falsity or reckless disregard for the

18  truth. The language in Kolstad, clearly it does

19  reference the standard you suggested, but it goes

20  further.

21      THE COURT: So what do you want me to say? It

22  says, "Unlike compensatory damages, which compensate the

23  victim for the harm she has suffered, the purpose of

24  punitive damages is to punish a defendant who has

25  engaged in intentional discrimination."

Page 37

1      You agree with that, right?

2      MR. ARONSON: Yes.

3      THE COURT: "And acted with malice or reckless

4  indifference to the rights of others."

5      What -- do you want me to say something further?

6      MR. ARONSON: Yes. The defendant -- it must be

7  shown that the defendant was motivated by evil motive or

8  intent, or when it involves reckless or callous

9  indifference to protected rights of others.

10      THE COURT: Slow down. "It must be shown

11  defendant acted with" --

12      MR. ARONSON: Was motivated -- or was motivated

13  by evil motive or intent.

14      THE COURT: Yup?

15      MR. ARONSON: Or its action involves reckless or

16  callous indifference to the protected rights of others.

17      THE COURT: These are sort of alternative --

18  additional alternative formulations of what is required,

19  in your view?

20      MR. ARONSON: Yes. The court clearly references

21  "malicious or reckless indifference," but they go on in

22  elaborating, and there's a quotation referring to

23  conscious indifference to consequences, criminal

24  indifference and gross negligence.

25      THE COURT: What about adding a sentence, Mr.

Page 38

1  Cohen, right after that -- on page 15 right after the
2  sentence at the top that ends, "to the rights of others.
3  It must be shown defendant was motivated by evil motive
4  or intent, or its action involved reckless or callous
5  indifference to others."
6      MR. COHEN: I object, your Honor, to the first
7  portion, that the defendant was -- must be motivated or
8  have evil motive. The second part I really don't object
9  to. I think that's just restating what you have here,
10 reckless or -- in a way it's restating what you have
11 here, "reckless or callous indifference to the rights of
12 others."
13     Evil motive, I mean, that may have been -- I
14 haven't read the Kolstad case recently, but that may
15 have been some part of the elaboration on the
16 definition, but I don't really think it's necessary to
17 have this in this -- to have a requirement that they
18 find that they were evil or something like that. That's
19 not --
20     THE COURT: What if I say "to punish a defendant
21 who's engaged in intentional discrimination, an act
22 of" -- I have to look back at the Kolstad case, I
23 suppose.
24     The second part of the formulation, Mr. Aronson,
25 I do agree it's kind of duplicative about reckless or

Page 39

1  callous indifference to others. It's pretty much what's
2  already said there, so I won't say that. The question
3  is whether you still want me to say, "It must be shown
4  defendant was motivated by evil motive or intent."
5      MR. ARONSON: Yes.
6      THE COURT: I'll think about that. I'll take a
7  look at the Kolstad case. Okay. What else?
8      MR. ARONSON: And the final point that we had,
9  your Honor, it really relates to backpay. And I don't
10 believe the plaintiff is entitled to recover backpay in
11 this case if there was merely discrimination. I think
12 she's entitled to recover backpay only if there was
13 retaliation, and that would have been her termination
14 was done when she was retaliated against.
15     I mean, when she was terminated, she was not
16 pregnant. So I think she could certainly recover
17 emotional distress for the discrimination while she was
18 pregnant and how she was treated, but I would suggest
19 she cannot recover backpay under those circumstances.
20     THE COURT: What about that, Mr. Cohen?
21     MR. COHEN: Well, the truth is, the crux of our
22 case as to the termination is that it was done in
23 retaliation, but there is -- and I think the evidence
24 bears it out -- that there is an element of our claim
25 that it was also discriminatory despite the fact that

Page 40

1  she wasn't pregnant. I mean, if they fired her because
2  she had been pregnant and asserted her rights, sought
3  restrictions and complained about being discriminated
4  against, I mean, that is also a form of pregnancy
5  discrimination, if they were motivated by some bias as
6  to pregnancy -- pregnant women in the workplace.
7      THE COURT: What about that? If they fired her
8  because she had been pregnant, it would be...
9      MR. ARONSON: I think he's talking about
10 retaliation. He just said because she asserted her
11 rights and --
12     THE COURT: Well, he's partially saying it's
13 retaliation. He's saying retaliation is the larger part
14 of his case, but he says that there's enough here that
15 the jury could conclude that they fired her because she
16 was pregnant and took maternity leave and the like. And
17 if they did it for that reason, that's not retaliation,
18 that's just discrimination. The discrimination doesn't
19 have to occur while she's pregnant; if it's because of
20 the pregnancy, it's still pregnancy discrimination,
21 right?
22     MR. ARONSON: I'm not quite sure I fully -- he's
23 arguing that they fired her because she had children, I
24 guess, or because she was pregnant at some point in
25 time? It doesn't make a whole lot of sense to me in the

Page 41

1  context of this case. And I see it as a retaliation
2  claim, and that's where --
3      THE COURT: Well, he's saying it's definitely
4  more than a retaliation claim. But he's saying it could
5  be -- it could be seen also as that, and therefore, he's
6  entitled to the instruction, he says, as a
7  discriminatory termination.
8      That's what you're saying, right, Mr. Cohen?
9      MR. COHEN: Yes, your Honor. I'd also point
10 to -- for example, there was evidence from Ms. McCusker
11 that she was angry about the maternity leave and her
12 being paid for the maternity leave, and that relates
13 directly to her pregnancy. I mean, then she gets back
14 from her maternity leave and she's fired within two
15 weeks.
16     So, you know, I think that our claim is for
17 both. I mean, the crux of it is that it was
18 retaliatory, but I think that there is some element
19 that -- of our claim that it was also a discriminatory
20 termination.
21     THE COURT: All right. I'm inclined to leave
22 that the way it is in light of that argument.
23     MR. ARONSON: All right. I just want to note my
24 objection to that, your Honor. That's all we have. I
25 did want to bring to the Court's attention, we had

Page 42

1  prepared as a chalk for a closing a timeline, and I have
2  just a small printout of it which I'm happy to submit to
3  the Court.
4      THE COURT: Just show it to -- if there's no
5  objection, it's fine with me.
6      MR. ARONSON: I just wanted to bring it to the
7  Court's attention.
8      THE COURT: Yeah. It's a good idea to show each
9  other chalks you're going to use beforehand so that
10  there's no dispute.
11      So the way I have it now, the -- what I'm going
12  to change is, I took out, on page 8, the "or
13  experiencing pregnancy-related"; I changed on page 9 the
14  paragraph we went over about what Ms. Librizzo claims;
15  I'm contemplating -- what I'm taking, sort of, time to
16  think about, and I'll tell you in the morning, is a
17  sentence about stereotypical thinking on page 9; I'm
18  adding to page 11 under "first" "and/or retaining an
19  attorney."
20      And as it presently stands on the punitives, I'm
21  going to instruct them on punitives, and I'm not aware
22  of a limitation under Mass. law that you can't get
23  punitives at all absent compensatory damages; and
24  therefore, as it presently stands, I'm going to delete
25  the sentence on page 14, the second sentence of Section

Page 43

1  3, the one that begins, "If you have not awarded
2  compensatory damages to Ms. Librizzo," to the end of
3  that sentence.
4      And then the jury -- the special verdict form
5  after Question 3 of damages would say, "If your answer
6  is yes, go to Question 4," in which they'll identify the
7  damages; and "If the answer is no, please proceed to
8  Question 5," which is the punitives. And then if -- and
9  in that circumstance if they said no damages but awarded
10  punitives, those punitives would only be awarded under
11  the Massachusetts claim; there would be no punitives
12  under the federal claim.
13      The other matter I'm thinking about, and I'll
14  decide on and tell you about in the morning, is whether
15  on page 15 at the end of that paragraph, right after "to
16  the rights of others," whether I should add, "and evil
17  motive or intent." So there's two things I'm thinking
18  about: The stereotypical thinking and the "and evil
19  motive or intent."
20      Other than that, any issues with the special
21  verdict form?
22      MR. ARONSON: Nothing other than what we
23  mentioned and one other -- I would like to be able to
24  refer to that in our -- in my closing. Would that be
25  acceptable?

Page 44

1      THE COURT: The special verdict form?
2      MR. ARONSON: Yes.
3      THE COURT: I don't have a problem with that.
4  You don't object to that, Mr. Cohen?
5      MR. COHEN: No.
6      THE COURT: I intend to give them a copy of the
7  final instructions to take back to the jury room unless
8  you object.
9      MR. ARONSON: I don't object, your Honor.
10      MR. COHEN: No, I don't have an objection.
11      THE COURT: Okay. All right. Thank you.
12  Nothing else, right? I have to look at this, and I've
13  just not had a moment to look at it yet, the document.
14      Let's -- I really want to get it to the jury
15  tomorrow by one o'clock. The one suggestion I have for
16  both of you is that we've been through an awful lot -- I
17  mean, I understand why these witnesses are called, and I
18  understand the need to go over, in effect, much of the
19  same ground on direct and cross with each of the
20  witnesses, and that's why by and large I've been silent
21  and not trying to shove you along. But at the same
22  time, I think that you don't need as much of the
23  foundation. They're generally familiar with, I think as
24  I am, the different dates and different key things. And
25  just, you know, zoom in with the last one -- who's the

Page 45

1  last one, Nichols? What you wanted about his
2  perspective, what you wanted to direct him to and what
3  you wanted to impeach him with and -- because I
4  figure -- how long are each of you going to be on close,
5  about?
6      MR. COHEN: I was thinking 15 minutes or so. 15
7  minutes, perhaps 20.
8      THE COURT: For closing arguments?
9      MR. COHEN: Right.
10      THE COURT: Okay. So 15 or 20 minutes.
11      And how about you, Mr. Aronson?
12      MR. ARONSON: It depends. I thought perhaps 30
13  minutes, a little bit more.
14      THE COURT: All right. I could see either of
15  you going up to 30 minutes. I wouldn't think you would
16  need more than 30.
17      MR. ARONSON: I would hope not.
18      THE COURT: So that would be an hour. I suppose
19  this is going to take me half an hour. That's an hour
20  and a half. Working backwards from one, that's
21  eleven-thirty, so that means done with the evidence at
22  eleven. It would be great if we could do that.
23      MR. ARONSON: I think that's certainly doable,
24  your Honor, depending on cross-examination, of course.
25      THE COURT: Right. I understand. I'm not

Page 46

1  trying to limit anybody's -- your cross, Mr. Cohen. But
2  I think we should all try to shoot for that. I think it
3  would be reasonable, and to move forward and -- we're on
4  Zarozny. We're still on direct?
5       MR. ARONSON: Yes. And I have perhaps five, ten
6  minutes left on direct.
7       THE COURT: See if you could do it in five, and
8  then you'll have your cross and then we could get to Mr.
9  Nichols. You know, that would be my preference: To get
10 done with the evidence at eleven, take the break, come
11 back, close, charge, done at one, they'll have lunch,
12 they'll start deliberating.
13      In terms of questions, my -- the best suggestion
14 is to stay close by. If they have some question or
15 verdict, then leave your cell phone numbers with Ms.
16 Simeone so she can reach you, and then we'll reconvene
17 for that. All right? Thank you very much.
18      THE CLERK: All rise. Court is adjourned.
19      (The proceedings adjourned at 5:34 p.m.)
20               * * *
21
22
23
24
25

Page 47

1       C E R T I F I C A T E
2
3       I, Marcia G. Patrisso, RPR, CRR, Official
4  Reporter of the United States District Court, do hereby
5  certify that the foregoing transcript constitutes, to
6  the best of my skill and ability, a true and accurate
7  transcription of my stenotype notes taken in the matter
8  of Civil Action No. 05-10918-LTS, Katerina Librizzo v.
9  The Berkshire Group.
10
11
12
       _____
       MARCIA G. PATRISSO, RPR, CRR
13     Official Court Reporter
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                          )
KATERINA LIBRIZZO,        )
                          )
          Plaintiff,      )
                          )   Civil Action
v.                        )   No. 05-CV-10918-LTS
                          )
THE BERKSHIRE COMPANIES   )
LIMITED PARTNERSHIP,      )
d/b/a THE BERKSHIRE GROUP,)
                          )
          Defendant.      )
                          )
```

BEFORE:  The Honorable Leo T. Sorokin,
Magistrate Judge

EXCERPT OF DAY 5 OF JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 14
One Courthouse Way
Boston, Massachusetts  02210
Friday, November 17, 2006

Marcia G. Patrisso, RPR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3507
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

Page 2

1  APPEARANCES:
2
   COHEN & SALES
3  By: Sol J. Cohen, Esq.
   43 Thorndike Street
4  Cambridge, Massachusetts 02141
   On behalf of the Plaintiff
5
   THE McCORMACK FIRM, LLC
6  By: Joseph H. Aronson, Esq.
     Laura G. Ryan, Esq.
7  One International Place
   Boston, Massachusetts 02110-0140
8  On behalf of the Defendant
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1      MR. COHEN: Thank you, your Honor. Good morning
2  again, ladies and gentlemen. I want to first thank you
3  again for spending the week here. You've heard a lot of
4  testimony, and you're going to have a lot of exhibits
5  and documents to look over, and they span over a number
6  of years. And you've heard some of the same facts over
7  and over, so thank you for doing this and helping the
8  parties to resolve this. This is a very, very important
9  case. I know it's important to Berkshire, but it is
10  extremely important to Ms. Librizzo and her family.
11      I first want to say, I spent most of the evening
12  last night in the ER. My two-year-old --
13      MR. ARONSON: Your Honor, I object.
14      THE COURT: Yeah. Mister --
15      MR. COHEN: The only thing I can say is: If my
16  eyes are red, if I look tired or haggard, don't hold it
17  against me. I didn't spend the night in a bar, believe
18  me.
19      MR. ARONSON: Your Honor.
20      THE COURT: Mr. Cohen. Let me just say: We all
21  sympathize with Mr. Cohen's situation; all of us have
22  our personal lives, we all have our struggles and
23  difficulties. You need to decide the case based on the
24  evidence in this case and the laws as I give them to
25  you.

Page 4

1      Go ahead, Mr. Cohen.
2      MR. COHEN: Thank you. This case is about a
3  woman's right to have her pregnancy be her first
4  priority. It's about retaliation as well. It's about
5  angry retaliation: Getting back at somebody for
6  asserting their rights to be free from discrimination.
7      When Wayne Zarozny told Ms. Librizzo that when
8  she was eight months pregnant and she had a doctor's
9  appointment to get to at 2:45, or to leave at 2:45 for a
10  prenatal appointment, and he comes in, knowing that, at
11  2:30 with a pile of work, and she says back to him, "You
12  know I have to go to my prenatal appointment," and all
13  he says back is, "This has to get done," when he does
14  that, he's violating her right to have her pregnancy be
15  her first priority. He's giving her the choice: It's
16  this job or it's your pregnancy. Take care of that
17  unborn baby -- or take care of your pregnancy or this
18  job. You can't do that.
19      When Ms. McCusker and Mr. Nichols, the day after
20  the -- the very morning after she tells them about a
21  doctor's note that she has that restricts her to 40
22  hours, the very next morning they write her -- bang,
23  they write her these warning memos threatening her
24  termination. That's a violation of her right to have
25  her baby -- her unborn baby and her pregnancy be her

Page 5

1  first priority.
2      You know, the one truthful thing that Ms.
3  McCusker said was that she was angry. She was angry
4  when she learned that Ms. Librizzo was going to be
5  paid -- or take her maternity leave and be paid during
6  her maternity leave, which was the company policy, by
7  the way. That was the one truthful thing she said. And
8  do you know what else she said? She said, "Had it been
9  up to me, I would have fired her six months ago." Well,
10  six months ago was right in the heart of her pregnancy.
11  Of course she would have.
12      And she was angry throughout the whole time.
13  For whatever reason she doesn't hire a temp, even though
14  for some reason they say they needed all of this
15  overtime and all of this work to be done. She doesn't
16  hire a temp. She doesn't seem to need a temp to cover
17  Ms. Librizzo's work during her maternity leave, so she
18  does Ms. Librizzo's work. And she's angry about that.
19  She told you she's angry. She's angry about her taking
20  the leave and being paid for it, and that anger builds
21  up. And when she gets back, the very first day she's
22  back, before she even has her coat off, Ms. McCusker is
23  telling her, "Oops, we're going to stay late tonight.
24  Got to stay late." And there was no need for it. You
25  heard Ms. Librizzo say -- tell you that all the work was

Page 6

1  getting done those first two weeks that she was back.
2  But within two weeks, bang, she was gone. That anger
3  showed itself.
4      And you heard Mr. Nichols himself say that -- he
5  showed his true colors. He showed his stereotypes when
6  he told you that one parent should be home with the
7  child. That's his opinion. Well, not everybody can do
8  that in life. Not everybody can do that in this
9  country.
10     There's two questions you're going to have to
11 answer: Did Berkshire make Ms. Librizzo's life worse
12 intentionally in order to try to get rid of her once she
13 became pregnant and once she needed those prenatal
14 appointments and once she needed the maternity leave;
15 and did they again retaliate against her when she fought
16 back. Yes, she's a fighter. She did fight back. She
17 has every right to serve her right to be free from
18 discrimination on the basis of her pregnancy. Did they
19 then take that and use it against her and retaliate
20 against her? And the answer to those two questions is
21 yes.
22     So what happened really here? Well, one thing
23 that's important is for you folks to take a look at the
24 timeline of events. Take a look at the history of each
25 event, because if you first start in that -- in

Page 7

1  September 1999 when she was hired, everything went very
2  well for those first two years when she had no
3  pregnancy, she had no prenatal appointments and she
4  didn't have any sort of restriction. I mean, she told
5  you that her position was one where she would work
6  occasional overtime, she would work a little bit beyond,
7  come in a little bit early. There was no problem with
8  that at all. She took that to be part of her position.
9  It wasn't a position, however, that required working
10 into the evening. That wasn't the idea.
11     During those first two years she got a great
12 review: In September of 2000; she got a great review in
13 September 2001. She got raises in both of those years.
14 Think about broadly, how does an employee like that
15 suddenly turn into a monster? And even in September
16 2003 she's still doing very well. That was before she
17 got later into her pregnancy and needed time for
18 prenatal appointments and a lesser ability to be able to
19 work into the evening as she got into the later stages
20 of her pregnancy because she was tired and hungry. So
21 take a look at the timeline because the very next day,
22 bang, as soon as she tells them that she needs a
23 restriction pursuant to her doctor for her pregnancy,
24 they write her these two warnings.
25     So she's there the first two years, everything's

Page 8

1  going great. Then comes Wayne Zarozny in 2001. They
2  say that the problems began in 2001. Serious problems,
3  they say. You heard some testimony, the reading of the
4  deposition where Ms. Librizzo who said, "Yes, he did
5  talk to me about the work." I mean, that's what
6  happens, supervisors talk about the work. It's never
7  perfect -- or it's not always perfect.
8      So that's what happened. There had been serious
9  problems, they say, from the outset. If there had been
10 serious problems, wouldn't you think there would be some
11 paperwork? I mean, this is a big company, they have a
12 huge -- one of the exhibits is their employee manual.
13 This isn't a company that just forgets to document
14 serious problems. There would have been something from
15 June of 2001 until the end of June -- December 2002.
16 There's nothing showing any serious performance
17 problems. They weren't there.
18     So what you have in 2001 is a very good review,
19 a raise and a bonus. And what about 2002? Again, they
20 say there were serious performance problems, no
21 documentation, but there was a bonus in 2002. She did
22 get a bonus in 2002, at the end of the year while they
23 were saying she had all of these serious problems.
24     What you also have in 2001 is Bernadette
25 Fernandes' testimony. Again, they're friends but she's

Page 9

1  not going to come into the federal court and lie to you.
2  She came in and told you -- you heard her testimony.
3  She told you about how she was treated when she was
4  pregnant, and it was very similar: They increased their
5  demands in an effort to get rid of her. And you heard
6  Ms. Librizzo's testimony when she said they were talking
7  to her at that time and asking her to help them to get
8  rid of her. That's what they do. Berkshire has created
9  this atmosphere where they want their work to come
10 before somebody's pregnancy.
11     So you have in 2002, while she's working under
12 Wayne Zarozny, you have this comment about, "I worked
13 with pregnant women before and I don't know what your
14 problem is." She goes in and talks to human resources
15 about that; they instruct Mr. Zarozny that that's
16 inappropriate. That's a discriminatory comment. And
17 you'll see the notes from the human resources' director
18 at the time about what she told Mr. Zarozny about that.
19     You also have a harassment about docking her pay
20 for prenatal appointments. Mr. Zarozny tried to deny
21 that, you might remember, but I suppose he remembered it
22 when he saw the e-mails talking about his idea to dock
23 her pay for taking prenatal appointments. Again, he
24 didn't want her to take prenatal appointments because
25 she was -- she was putting her pregnancy first over the

Page 10

1   work.
2       He's harassing her -- when she leaves the office
3   at 5:30 on a Friday because she's tired, and this is now
4   getting into July of 2002 when she's seven months
5   pregnant -- he's harassing her about having left at
6   5:30, which were the office hours.
7       And then comes the August 14th, 2002, incident.
8   Picture this now:  She's eight months pregnant by this
9   time, a month away from her delivery, and she's got this
10  2:45 appointment, to where she's got to leave at 2:45 to
11  get to a prenatal appointment.  Wayne Zarozny knows all
12  about it.  And he comes in with this pile of work at
13  2:30 knowing that, because he knows that he wants to set
14  her up to fail.  He knows she can't do it.  He gives her
15  the choice:  It's your pregnancy or do the work.  This
16  needs to get done.
17      Imagine what she felt like when she goes off.
18  She chose to, rightfully, go to her prenatal
19  appointment.  Imagine how she's feeling.  She's about to
20  have her first child and here's her manager telling her,
21  essentially, you may be gone if you don't get this work
22  done.  I don't care about, you know, 15 minutes you have
23  to leave for your prenatal appointment.  You may be
24  gone.
25      Think about how she's feeling as she's driving

Page 11

1   to the prenatal appointment.  It's stressful enough when
2   you're having a baby, not really knowing what the
3   financial situation's going to be like afterwards and
4   how much it costs to raise a baby -- to raise a child.
5       So she leaves then for maternity leave in
6   September of 2002.  And you heard this business with --
7   you know, they tried to say in their position statement
8   they were so generous that they gave her a month
9   earlier -- they gave her a month -- additional maternity
10  leave.  That just didn't happen.  They just made that
11  up.
12      She goes out on maternity leave.  She comes back
13  in 2003 and Wayne Zarozny, like Ms. McCusker, is
14  angry -- this is the atmosphere at Berkshire -- Wayne
15  Zarozny is angry that she was out on her maternity
16  leave.  He was angry and he tells her, "You left the
17  company high and dry on your maternity leave."  That's
18  the atmosphere that was created here.  And you can't do
19  that.
20      Do you know something?  There are a lot of good
21  business people out there, and the good ones, they don't
22  treat people like this.  You know, when you have to pick
23  up the slack for somebody because of a disability or
24  because of a pregnancy a little bit, that's just life.
25  Life isn't always fair.  And the good business people

Page 12

1   know that.  But Berkshire has created this atmosphere
2   where they want their employees, like Katerina Librizzo,
3   to take the work first and the pregnancy and the unborn
4   child second.
5       So moving on now to the time in April of 2003
6   when she goes back to Chris Nichols.  Everything again
7   is going very well.  At the outset Mr. Nichols tells
8   her, "Well, we could think about giving you this new
9   assistant controller position but I know you have some
10  limitations in the evenings with, you know, your new
11  child at home, and you have family obligations that we
12  know you can't really stay very late into the evening.
13  So your position is going to be more like a
14  bookkeeper's, and we're going to hire an assistant
15  controller to do the heavy CPA accounting-type work."
16      And so they do that.  They hire Kelly McCusker,
17  and everything's going fine again.  She works well with
18  Kelly McCusker.  She gets a great review in September of
19  2003.  The second quarter of the SEC filing went very
20  well.  Even though Kelly now says that Ms. Librizzo
21  didn't do a lot of work on it, take a look at her
22  review.  Take a look at the review that you'll have with
23  you in September of 2003 because it says that she really
24  did a good amount of work on it.  She did really help
25  out on that and do a good amount of work on that second

Page 13

1   quarter filing, and she even came in early to help get
2   it done.
3       So there was no problem with that.  There was no
4   problem then because she was at the early stages of her
5   pregnancy then.  She was pregnant in May of 2003; the
6   quarter ended June 2003.  It wasn't until later in the
7   fall when they wanted her to do more work, more overtime
8   and she couldn't.  That's when the problems began.  She
9   didn't just, like a switch, go from being this great
10  employee that you'd seen in September of 2003 in the
11  performance review and all of a sudden become this
12  monster that they want you to believe she became.  It
13  just didn't happen like that.  I mean, you're going
14  to -- you get to use your common sense.  And all of you
15  come into this with common sense and logic, so think
16  about the timeline.  Somebody doesn't just flip a switch
17  and turn into a monster like that.
18      So we get into the middle stages of her
19  pregnancy, and they say something just happened.  Well,
20  do you know what it is that just happened?  They take
21  away the raise that they promise her after they tell her
22  she's doing great and tell her she's getting a raise,
23  and yes, she's frustrated by that.  And I think most
24  people would be.
25      So she goes into human resources, and given what

Page 14

1  happened with Wayne Zarozny in the past, his comments
2  and so forth and his giving her the option to choose her
3  pregnancy or choose her job, well, yeah, of course,
4  naturally she feels that maybe this is related to her
5  pregnancy again. She's pregnant again. I don't know
6  whether it was, but she felt that way, and it was
7  reasonable for her to feel that way.
8       And so she goes in and says, "I think this is
9  related to my pregnancy," this raise problem. And he
10 doesn't -- I mean, he then -- you heard him testify. He
11 tried to deny it, of course, but you heard him testify
12 that he told Kelly McCusker and Dan -- Chris Nichols and
13 one of Katerina's managers about her complaint that she
14 felt that the raise was related to the pregnancy and
15 this was pregnancy discrimination.
16      Well, things got much worse after that. And
17 that's what happened. She didn't just flip a switch and
18 become a monster, what happened was, she complained.
19 She asserted her rights to be free from discrimination.
20 She was asserting her right to be free from
21 discrimination and things went downhill after that.
22 More requests -- as they know she's getting later into
23 her pregnancy, they make more requests for overtime,
24 more requests for hours, knowing that she can't do it.
25 They're setting her up to fail.

Page 15

1       So she does the overtime. She's doing the best
2  that she can. You heard her testify, "They kept asking
3  for more and more, and I was doing it until October
4  21st." October 21st, 2003, they ask her to stay late
5  and she can't. She can't stay late so she doesn't.
6  October 22nd, bang, they give her this memo, and you'll
7  see it, it's one of the exhibits, where they give her
8  three options. They're talking about her leaving, is
9  one of the options. When you look at that memo, look at
10 the three options, okay?
11      The three options are: Number one, leave the
12 company so you can go to some other company, which is
13 really what they wanted, okay? Leave the company so you
14 could go to some other company. Was it realistic? Is
15 that really an option, that she's going to go out at
16 five months pregnant and, you know, four months later
17 she's going to go out on maternity leave and have
18 somebody hire her like that? That's not going to work.
19 They knew that. They're not dumb. They knew that that
20 wasn't a real option.
21      So let's look at the second option. The second
22 option in that memo on October 22nd was stay within the
23 company and transfer to a different position. Well,
24 that would have been great, and she wanted that, except
25 for one problem: There was no position. So they paper

Page 16

1  this -- they paper it and say, "Here are your -- we're
2  so great, we're going to give you three options," but
3  there's really only one. And the one option she had was
4  to stay with the company and do the best she could. So
5  that's what she took. And she knew that -- she knew
6  that there was only one option and they knew that there
7  was only one option: To leave the company. That was
8  what they really wanted.
9       So she stays with the company. And you'll see
10 her memo. Again, in her memo two days later when she
11 tells them what she's going to do, she says, "I'm going
12 to stay, do the best I could. I'll work reasonable
13 overtime -- I'm pregnant so I'll work reasonable
14 overtime. You know, don't expect me to stay into the
15 wee hours of the night."
16      That's October 24th. And yes, she does have the
17 doctor's note by then, but she feels committed to the
18 company. She says, "I'll do a couple of extra hours,"
19 all right? I don't think -- if they're going to be
20 reasonable and keep it to some kind of minimum knowing
21 that I'm pregnant, I'll do some reasonable overtime. I
22 can do it. I think I can do it. And so she doesn't
23 give them the note. There's no choreography here. She
24 doesn't give the note because she doesn't really think
25 they're going to be so unreasonable to make her stay

Page 17

1  late into the evening.
2       So October 24th she tells them she's going to
3  stay, and she says in her memo, "I think you're trying
4  to force my out. I think you're trying to terminate me
5  because of my pregnancy." Well, again, things got
6  worse, and they continued to make demands for heavy
7  overtime knowing that she can't do it. They knew she
8  can't do it so they're trying to get rid of her. And so
9  if they document that she's not working overtime as
10 required, then look back again at that October 22nd
11 memo. It says "now overtime will be required." That
12 was something they added as a mandatory requirement of
13 the position. They wouldn't have stuck the word in
14 "now" had it not been something new, because before this
15 it had been a little bit of overtime here and there and
16 no problems. It was a result of her complaining about
17 the raise and feeling it was pregnancy discrimination
18 and a result of her putting her pregnancy first. As a
19 result of that, they made it a position that required
20 mandatory heavy overtime. Take a look at that October
21 22nd memo.
22      Then they continued to make these demands
23 knowing that she can't fulfill them, because they know
24 she's going to have to leave if she can't or they're
25 going to terminate her.

Page 18

1   October 29th she asserts her rights for -- she
2 gives them the doctor's note. She tells them by e-mail
3 on October 29th that she's got this doctor's note, you
4 know, enough is enough. Enough of this, you know, you
5 can't work, you can't work, you can't do the job.
6 Enough of this. "I've got a doctor's note, let's put
7 this thing to bed. I'm only going to work 40 hours.
8 Here's my doctor's note."
9   And then what do they do? Bang. The next
10 morning Kelly McCusker writes this single-spaced warning
11 memo threatening her with termination. Chris Nichols --
12 they got together and Chris Nichols does the same thing.
13 October 30th, 2003. And they told you they were angry.
14 They were angry about her need for a restriction or
15 asserting her rights.
16   I mean, they thought -- they thought it was
17 going to be easy just to get rid of her. Just a paper
18 that -- put on paper that now the job requires overtime,
19 bang, she -- knowing she can't do it, they thought she
20 would leave, and they were angry once she didn't. They
21 were angry because she needed the restriction and they
22 couldn't -- they couldn't get rid of her at that point
23 in time.
24   This business with the choreography and the
25 scheme with me? It's hogwash. Take a look at my

Page 19

1 letter. I wrote them a letter on November 6th -- on
2 November 4th, and I faxed it to them on November 6th.
3 You'll see it in the evidence. And that letter, if you
4 take a look at it, it shows we're not looking for
5 anything. All we're looking for them is to stop it.
6 Stop harassing her and let her work in peace. Take a
7 look at the letter. Judge for yourself whether you
8 think there's a scheme behind this.
9   So when they do that, when they get my letter,
10 the next thing they do is, even though they intended to
11 just stick these warnings in her file and these threats
12 of termination, to paper it so that later it would look
13 like she was aware of the threat of termination. They
14 don't give her these memos on October 30th, they just
15 stick them in the file. I write my letter, the next
16 day, bang, they give her -- it was like, Oh, maybe we
17 should give her these now. Now's a good time, now that
18 she's got a lawyer involved and she's engaging in -- the
19 judge will tell you in his instruction -- engaging in
20 protected activity is an element of our retaliation
21 case. When she engaged in protected activity by my
22 letter, then, bang, they give her those memos
23 threatening her termination.
24   And then some time goes by. There was this
25 testimony by Kelly McCusker that she was still awful

Page 20

1 during the months after my letter and three and a half
2 months before her leave, but yet there's no
3 documentation of anything and no one seems to be aware
4 of any sort of proof that she was bad during those
5 months. But of course Kelly and Chris are angry. She
6 was angry that she asserted her rights, just as they
7 told you.
8   And then she goes on maternity leave in February
9 of 2004. She has the child. Her second child. She
10 goes on maternity leave and within two weeks -- she
11 comes back on April 30th. And at this point Kelly
12 McCusker is boiling. She told you she was angry about
13 the whole maternity situation, she would have fired her
14 had she had the chance while she was pregnant. And
15 within two weeks she's gone.
16   The first day she's there, on April 30th,
17 it's -- before she even gets her coat off, it's, "You're
18 going to stay late," even though there was really no
19 need to. And lo and behold, here's this guy, David
20 Meir, who they desperately tried to tell you wasn't a
21 replacement. And I mean, on the one hand they say he
22 did her duties, he's got her title, but he's not her
23 replacement. I mean, common sense, folks. They're not
24 going to trick you into thinking that he wasn't her
25 replacement. And I think even Chris Nichols finally

Page 21

1 agreed that ultimately he did replace her.
2   And that was the guy, by the way, if you look
3 back to the fall of 2003, that Kelly slipped and said to
4 Katerina, "I've got a guy, David Meir, who would be
5 great for your position." Well, she did. She had this
6 termination set up. She had it all planned out -- while
7 she was so angry doing her position -- she had it all
8 planned out to terminate her, and within two weeks she
9 did.
10   Take a look at -- you heard some testimony about
11 the termination memo, and that's important. It's one of
12 the exhibits that's dated May 12th. And the -- what
13 happened is, she was terminated on May 13th, and -- but
14 Kelly had this planned out. She had actually drafted
15 the termination memo in advance of the day of the
16 termination. She had it all planned out. And that's
17 why it's dated May 12th. She may have added the last
18 paragraph saying this is the incident that triggered it
19 or whatever she says in it, but she had that planned
20 out, she just was sloppy again and said -- and left the
21 date May 12th. And that's why it's dated May 12th. She
22 had this planned out in advance. She was going to get
23 back at Katerina Librizzo for asserting her rights, for
24 thwarting her plan for getting rid of her.
25   You're going to get some instruction from the

Page 22

1  judge at the end of the case about damages. And, yes,
2  the defense says this is revolving around money. Well,
3  yeah, I mean, we work to get paid. There's nothing
4  wrong with that. And this is an employment case. So,
5  yes, it is about money. And as a result of the
6  termination she did lose money. If you look at the
7  paperwork and the documents and listened to -- and heard
8  the testimony, she made 56,000 a year at Berkshire, and
9  she had bonuses of about 4,000 a year. So she had
10 annual income from them of about $60,000.
11      If you look at her 2005 W-2, she made about
12 23,000. And so that's about $37,000 a year for two
13 years, and then for the year 2006 it comes to about
14 $19,000 for a total of -- in back-pay damages of about
15 93,000, if you find that they did discriminate and
16 retaliate against her.
17      You also are going to have an instruction about
18 emotional distress. And you heard some testimony from
19 Ms. Librizzo about how she felt when this was happening.
20 And again, I ask that you look and you think about what
21 was happening in her mind when Wayne Zarozny gave her
22 the choice of taking care of that unborn baby and her
23 pregnancy or "this needs to get done." Think about how
24 a young mother who's having her first child is going to
25 feel about that.

Page 23

1      And she testified that she did go through a
2  period of depression and anxiety about what was going to
3  happen financially after she was terminated. Naturally.
4  I mean, she had a three-month old at that point, she had
5  a one-and-a-half year old at that point. This is a
6  working family. Her husband, James, works as an EMT and
7  she, you know, was working all along. So of course,
8  naturally she's going to have anxiety about what's going
9  to happen financially as a result of the termination.
10      And if, ladies and gentlemen, you find that they
11 did, and that they were malicious in this and that anger
12 that Kelly McCusker talked about resulted in this
13 termination, you should award punitive damages. Those
14 are damages to punish the defendant and to deter them
15 from doing this to other people. And part of your
16 consideration, if you're thinking about -- if you're
17 considering punitive damages, part of the consideration
18 should be this document, which you'll have with you,
19 which is their asset -- their balance sheet. And you'll
20 see how the company has $214 million in assets. And so
21 we ask that you make them feel this because what they
22 did was despicable.
23      Think again, ladies and gentlemen, about Wayne
24 Zarozny. She's eight months pregnant at that point.
25 He's threatening to terminate her by saying: Do this

Page 24

1  work. Get it done or go to your -- go to your
2  appointment and take care of your unborn baby. This is
3  a point in time when people -- people that are about to
4  have their first child, this is a joyous occasion. This
5  is a momentous occasion in life. It shouldn't be an
6  occasion where you are just put in that situation where
7  you have no idea what's going to happen to you if you go
8  to a prenatal appointment.
9      That, ladies and gentlemen, is just the low of
10 the low. Kelly McCusker's anger about her taking her
11 maternity leave is just, again, as low as it gets.
12 She's taking her maternity leave. That's what people do
13 when they have a baby. And she would have -- had it
14 been up to her, she would have fired Ms. Librizzo for
15 that. The credibility of witnesses: You saw Kelly
16 McCusker testify. You judge whether she was telling you
17 the truth or not. We don't think she was.
18      So what did Mr. Aronson say at the beginning of
19 this -- of his opening statement at the beginning of the
20 trial? He said, "Hold us accountable." Well, that's
21 what you should do, ladies and gentlemen: Hold
22 Berkshire accountable. They are the low of the low for
23 doing this. Hold them accountable.
24      Again, I want to thank you for being here and
25 helping us to resolve this dispute. What you're doing

Page 25

1  here is so important and I -- I am proud to represent
2  Katerina Librizzo. The Berkshire Company is a
3  multimillion dollar company. I'm proud to represent
4  Katerina Librizzo in this court today. Thank you.
5      THE COURT: Thank you very much, Mr. Cohen.
6      (The jury charge is delivered by the Court.)
7      (Discussion at sidebar and out of the hearing of
8  the jury.)
9      MS. RYAN: Your Honor, we still have a few
10 objections.
11      THE COURT: Okay.
12      MS. RYAN: On page 4 where it says, "First,
13 through the sworn testimony of witnesses, both on direct
14 and cross-examination," we would ask that deposition
15 testimony of witnesses that have been read into the
16 record, that that be included as a type of evidence that
17 can be considered.
18      THE COURT: Do you have any objection to that?
19      MR. COHEN: No.
20      THE COURT: Okay. So I'm just going to say that
21 deposition testimony read into the record is also
22 evidence to be treated like any other evidence?
23      MR. ARONSON: Yes.
24      THE COURT: Okay.
25      MS. RYAN: On page 9, with respect to the

Page 26

1  discussion we had last night regarding "Direct evidence
2  can consist of statements of a defendant related to the
3  plaintiff's claim that suggests a discriminatory
4  attitude towards pregnant women," we would just like to
5  note our objection that we believe, still, that's
6  indirect evidence.
7      THE COURT: So noted.
8      MS. RYAN: And lastly, with respect to the
9  punitive damages, we appreciate that each of the claims,
10  we've combined them for one jury instruction, but we
11  feel particularly with respect to punitive damages, that
12  this is putting our client at a distinct disadvantage,
13  and we believe there are some differences in the law.
14      And I would direct your attention to a 1998
15  decision --
16      THE COURT: What do you want me to say to the
17  jury?
18      MS. RYAN: I would like you to add language from
19  Bain versus City of Springfield, a Massachusetts Supreme
20  Court decision, that "when the defendant's conduct
21  warrants condemnation and deterrence." And it's right
22  here at the beginning of page 14.
23      I'm sorry, there's one other. The first
24  sentence, "If you find that the Berkshire Group
25  discriminated," I think that needs to be "intentionally

Page 27

1  discriminated" because that's a very --
2      THE COURT: I think it says that on the next --
3  on page 15 at the top it says, "Is to punish defendant
4  who's engaged in intentional discrimination."
5      MS. RYAN: We would ask that it be inserted also
6  in the first sentence in that it's a lead-off sentence
7  with regard to punitive --
8      THE COURT: Tell me about the other issue.
9      MS. RYAN: The other issue is that we don't
10  believe that it currently includes all Massachusetts
11  law. The language we would want added is "acted with
12  malice or reckless indifference to the rights of others
13  and where the defendant's conduct warrants condemnation
14  and deterrence." Your Honor, that comes from the Bain
15  decision.
16      THE COURT: "And where the defendant's conduct
17  warrants condemnation"?
18      MS. RYAN: And deterrence. That's a direct
19  quote.
20      THE COURT: Do you object to that?
21      MR. COHEN: I do, your Honor. Your instruction
22  was accurate.
23      THE COURT: I mean, basically you argued that
24  they should condemn them because they were despicable.
25  Those were the words you used. What's the difference?

Page 28

1      MR. COHEN: I'll concede that.
2      THE COURT: Okay. So I'll tell them that.
3      MS. RYAN: Very good.
4      THE COURT: Very good. Anything else?
5      MR. ARONSON: No, your Honor.
6      THE COURT: Do you have any issues?
7      MR. COHEN: I do, your Honor. Page 11, the
8  elements of retaliation. The third element. I would
9  prefer that -- essentially, I guess what I'm looking for
10  is the last word, instead of "discrimination," it be
11  "protected conduct" -- I'm sorry. Because of --
12  substitute "protected conduct" for "complained about
13  discrimination." I think it would make sense to reread
14  those three things to put it into context.
15      THE COURT: Do you think that's necessary? I
16  can explain to the jury that -- first, what protected
17  conduct is, and I think -- I don't see where they'll be
18  confused at all.
19      Anything else?
20      MR. COHEN: No, your Honor. That's my
21  objections.
22      THE COURT: All right. Other than those
23  objections, you're content. So this is what I'm going
24  to do: I'm going to tell the jury that you all have
25  reminded me about two things: One, that deposition

Page 29

1  testimony read into the record is to be treated like any
2  other evidence.
3      And I'm just thinking about how to say the other
4  thing. I'm trying to think about what to reread. I
5  think what I would propose saying -- or reading the
6  first paragraph of the punitive damages section and
7  adding those couple of words, "and where the defendant's
8  conduct warrants condemnation and deterrence."
9      If you really want, I'll reread the whole
10  punitive damages section, but I think that's --
11      MR. ARONSON: I would rather you not reread the
12  entire paragraph, your Honor.
13      THE COURT: What do you propose?
14      MR. ARONSON: That you just make reference to
15  that particular subject.
16      THE COURT: How about I read the sentence? I'll
17  read that sentence. That's fair. I'll read the whole
18  sentence.
19      MR. ARONSON: That's fine.
20      THE COURT: Okay. You're fine with that? I'm
21  just going to read that sentence and add the words to
22  it.
23      MR. COHEN: You're going to read --
24      THE COURT: Exactly. Okay. Other than that,
25  you're all set?

Page 30

```
 1        MS. RYAN:  We are.  Thank you.
 2        THE COURT:  I'll add this to the typed
 3   instructions, and just as I read them.  And I've made
 4   one other change:  I said "two" instead of "three"
 5   because it's a typo.
 6        (End of discussion at sidebar and transcript
 7   excerpt.)
 8
 9
10        C E R T I F I C A T E
11
12        I, Marcia G. Patrisso, RPR, CRR, Official
13   Reporter of the United States District Court, do hereby
14   certify that the foregoing transcript constitutes, to
15   the best of my skill and ability, a true and accurate
16   transcription of my stenotype notes taken in the matter
17   of Civil Action No. 05-10918-LTS, Katerina Librizzo v.
18   The Berkshire Group.
19
20
21        _____
           MARCIA G. PATRISSO, RPR, CRR
22         Official Court Reporter
23
24
25
```